UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
                                  :

NASTASI & ASSOCIATES, INC.,         :

                      :

            Plaintiff,      :

                      :         20-CV-5428 (JMF)

      -v-                :

                      :       OPINION AND ORDER

BLOOMBERG, L.P. et al.,           :

                      :

           Defendant.      :

                      :
-----------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

      In 2018, the New York District Attorney's Office announced the indictment of several

people, including employees of Bloomberg, L.P. and Turner Construction Corp. ("Turner"), in

connection with a bribery and kickback scheme relating to construction work at Bloomberg.

Following that announcement, Plaintiff Nastasi & Associates ("Nastasi"), an interior drywall

subcontractor that had done work on Bloomberg projects, brought this lawsuit against

Bloomberg, Turner, Eurotech Construction Corp. ("Eurotech"), and Donaldson Acoustics, Co.

Inc. ("Donaldson Acoustics"), along with a number of people who are or were employed by

these companies (the "Individual Defendants").[1]  Nastasi alleges that Defendants organized and

participated in a large-scale bid-rigging and bribery scheme.  It brings antitrust claims pursuant

---

[1]      The Individual Defendants (with their positions at the time of the alleged conspiracy) are:
Javier Paulino (Bloomberg Head of Purchasing), Marilyn Francisco (Bloomberg Facilities
Director), Anthony Guzzone (Bloomberg Head of Global Construction), Dale Summerville
(Bloomberg COO of Global Real Estate and Facilities), Lauren Eckhart Smith (Bloomberg
Global Head of Facilities and Real Estate), Michael Campana (Bloomberg Construction
Manager), Vito Nigro (Turner Project Superintendent), Fay Devlin (Eurotech CEO), Robert
Donaldson (Donaldson Principal and/or Officer) and Douglas Donaldson (Donaldson Principal
and/or Officer).  Compl. ¶¶ 83, 113, 114, 157, 145.

to Section 1 of the Sherman Act, 15 U.S.C. § 1, and the Donnelly Act, N.Y. Gen. Bus. L. § 340 *et seq.*; claims under the Racketeering Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1962(c) and (d); and common-law claims for negligent supervision and negligent retention.  Defendants now move, pursuant to Rule 12 of the Federal Rules of Civil Procedure, to dismiss the claims.  For the reasons described below, the motion is almost entirely DENIED.

## BACKGROUND

Unless otherwise noted, the following factual summary is drawn from the facts alleged in the Complaint, which are taken as true and construed in the light most favorable to Nastasi for purposes of this motion to dismiss; from documents attached to, or incorporated by reference in, the Complaint; and from matters of which judicial notice may be taken.  *See, e.g.*, *Empire Merchants, LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 139 (2d Cir. 2018).

Nastasi and most Defendants are players in the interior construction services market in the greater New York region.  ECF No. 52 ("Compl."), ¶¶ 62-65.  According to the Complaint, the market is supposed to work as follows.  A corporate consumer, such as Bloomberg, will hire an interior construction general contractor, such as Turner, "to rebuild or renovate existing buildings, including by performing the design and planning for interior construction projects and working with subcontractors to perform the construction services."  *Id.* ¶ 63.  The general contractor then puts out "requests for proposals," or RFPs, seeking competitive bids from a "highly concentrated group of subcontractors," including Nastasi, Donaldson Acoustics, and Eurotech, to perform specific services, including drywall, carpeting, plumbing, millwork, and electrical system work.  *Id.* ¶¶ 6, 64.  The general contractor runs the bidding process, which includes "leveling," a process that "allow[s] the general contractor to organize the bids and determine the lowest bidder by ensuring that each of the bids provides an 'apples to apples'

comparison for the Corporate Consumer." *Id.* ¶ 65.  In this way, the corporate consumer is "led to believe" that "the winning bid is the most competitive bid for the particular construction service." *Id.*

According to the Complaint, however, Turner has, for much of the last ten years, used its power as "one of the largest interior construction general contractors in the world" to corrupt this purportedly competitive process "through bid rigging and bid rotation schemes," as well as kickbacks and bribes, allowing it to "profit[] from the resulting price inflation." *Id.* ¶¶ 66, 68. Nastasi alleges that, when Turner was hired as a general contractor, it coordinated the bids of the subcontractors, determining which subcontractor would win the project before the bids were even made.  *Id.* ¶ 70.  Because the subcontractors all knew that the winning bidder was predetermined, and "usually who the winning bidder would be," they had no incentive to submit competitive bids.  *Id.* ¶¶ 71, 74.  Instead, the "winning" subcontractor would submit an inflated bid, which Turner would pass along to the corporate consumer.  *Id.*  The other subcontractors would coordinate with each other and Turner to enter bids that were above the lowest, but "close enough to the winning number to create the appearance of a fair process." *Id.* ¶ 72.  In addition, the Complaint alleges that several Bloomberg executives were in on the plan.  *Id.* at ¶¶ 72, 88.

The "winning" subcontractor benefitted from the scheme because its inflated bid was more than a competitive market would otherwise bear.  *Id.* ¶¶ 71, 76.  Each "losing" subcontractor participated so that Turner would choose it to win next time — if a subcontractor refused to play ball, the Complaint alleges, "the subcontractor would not be selected in future bid rotation or bid-rigging arrangements." *Id.* ¶¶ 71, 75.  Turner would then further inflate the price that it presented to the corporate consumer, pocketing the price differential between what the corporate consumer would pay and the amount it passed along to the winning subcontractor,

sometimes demanding additional price concessions from the subcontractor at that point.  *Id.*
¶¶ 74-76.  The losers in this scheme, then, were the corporate consumers, including Bloomberg,
which overpaid for interior construction work, and any subcontractors who refused to participate
in the conspiracy, such as Nastasi, as they were excluded altogether from the market.  *Id.* ¶ 77.

Nastasi, which was an interior drywall subcontractor at all times relevant to this case,
alleges that it was harmed by the above-described scheme in connection with two Bloomberg
projects — one at 120 Park Avenue (the "120 Park Project") and the other at 731 Lexington
Avenue (the "731 Lexington Project").  In 2005, Nastasi had been awarded a contract, through
an RFP, for maintenance work to be performed at Bloomberg's then-existing headquarters at 731
Lexington Avenue.  *Id.* ¶ 106.  The 2005 Services Agreement between Nastasi and Bloomberg
required Nastasi to have six employees on site, full-time, to perform work on the building.  *Id.*
The 2005 Services Agreement was to run for an initial term of two years, with automatic renewal
on a month-to-month basis until termination.  *Id.*  In 2010, Bloomberg issued a new RFP for the
services work at 731 Lexington Avenue and again awarded the contact to Nastasi.  *Id*. ¶ 107.
The 2010 Master Services Agreement similarly had an initial term of two years and was to be
automatically renewed for an additional year at the end of each term, unless terminated by either
party with thirty days' written notice.  *Id*.

In 2010, Bloomberg also announced that it had acquired real estate at 120 Park Avenue to
build a new headquarters to accommodate its rapid growth.  *Id.* ¶ 111.  That same year,
Bloomberg hired Turner as the general contractor on all its major construction projects
throughout New York City, including the 120 Park Project, replacing its former go-to general
contractor, Structure Tone.  *Id.* ¶ 82, 111.  According to Nastasi, the switch "coincided with the
revelation of Structure Tone's involvement in a massive," but unrelated, "five-year bid rigging

and bribery scheme that culminated in a series of corruption charges and a $55 million restitution payment."  ECF No. 73 ("Pl.'s Opp'n), at 4; *see* Compl. ¶ 80.  Turner issued the RFPs for subcontractor work to be performed on the 120 Park Project.  *Id.*  Nastasi believed the bidding process "would be fair and competitive" and that it was likely to be awarded the contract because of its history of "twenty years of consistently performing quality services for Bloomberg and consistently winning contracts it bid for at Bloomberg's locations."  *Id.* ¶¶ 111, 114.

The 120 Park Project was huge — it was slated to cost billions, including approximately $40 million in carpentry and related construction work, and was to be bid out in phases over at least five years.  *Id.* ¶ 121.  In late 2010, Nastasi began submitting bids to Turner for the interior drywall work, which Turner reviewed in consultation with Bloomberg.  *Id.* ¶¶ 111, 114.  Nastasi alleges that it was the lowest bidder for the first two phases of work, yet in each instance Donaldson Acoustics was awarded the job "in exchange for, among other cash and non-cash bribes, building a cigar room and wine cellar, at no cost," for a Turner purchasing manager.  *Id.* ¶ 123.  In or around July 2011, Nastasi submitted a bid for the third phase of work.  *Id.* ¶ 125. Nastasi's bid was approximately $800,000, and it "was informed and was aware that it was the lowest bid for the work to be performed."  *Id.* ¶ 126.  Nevertheless, when the bidding closed, Nastasi learned that Donaldson Acoustics had been awarded that contract as well.  *Id.*  Anthony Nastasi, Nastasi's principal, began to investigate, calling associates at Turner who confirmed that Nastasi had been the lowest bidder.  *Id.* ¶ 127.  Nastasi later discovered that its bid had been "manually adjusted from $800,000 to $900,000," creating the false impression that Donaldson Acoustic's bid had been the lowest.  *Id.* ¶ 128.

Armed with this information, Nastasi "confronted" Defendant Anthony Guzzone, Bloomberg's Head of Global Construction.  *Id.* ¶ 129.  "In an email dated July 7, 2011, Anthony

Nastasi wrote: 'I was told I did not get the Bloomberg job so that makes me 0-3.  I was greatly disappointed especially at the fact that I was the legitimate low bidder but somehow the #'s changed at the last minute and I lost the job by 10k?'"  *Id.*  Guzzone responded: "Anthony, I understand your disappointment but according to the leveling sheet that was presented to me, Donaldson was the low bidder and it is for much more than 10k.  Unfortunately I do not have control over the bid process and am subject to using Turner[']s recommendation unless there is an obvious reason why I shouldn't."  *Id.* ¶ 130.  When Nastasi pressed Guzzone about the losing bid, Guzzone replied: "give me a reason to do something about this."  *Id.* ¶ 138.  Nastasi alleges that, at the time, it "did not know what Guzzone meant, but, in retrospect, Guzzone was apparently alluding to making illegal payments to join the bid-rigging scheme."  *Id.*

According to Nastasi, Guzzone, along with Defendants Michael Campana, Vito Nigro, Javier Paulino, Marylin Francisco, and others, "were accepting bribes from the Subcontractor Defendants," — Eurotech, Donaldson Acoustics, Duane Donaldson, Douglas Donaldson, and Fay Devlin — "falsifying records, and inflating bids on the 120 Park Project."  *Id.* ¶ 131.  This allegation is supported by the fact that, in or about December 2018, a state grand jury in Manhattan returned an indictment accusing Guzzone, Campana, and Nigro, among others, of participating in a "conspiracy to steal millions of dollars from Bloomberg LP during construction projects at Bloomberg LP properties located at 120 Park Avenue."  ECF No. 60-1, at 3 ("Indictment"); *see* Compl. ¶¶ 91-92, 198.[2]  One of the overt acts listed in the criminal indictment occurred "[i]n the Spring of 2011," when Guzzone, Olson, Nigro and "a co-

---

[2]      The Court may consider the Indictment, ECF No. 60-1, because it is "integral" to the Complaint.  *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016); *see* Compl. ¶¶ 21, 90-93, 122, 132-34, 243, 258 (referencing and quoting from the Indictment).

conspirator known to the Grand Jury . . . , met and discussed a larceny/kickback scheme involving subcontractors seeking work at Bloomberg LP."  Indictment 4, ¶ 1.

The Complaint alleges that Turner coordinated the bids among subcontractors in connection with the 120 Park Project, deciding which subcontractor would be awarded which type of job.  *Id.* ¶ 140.  In addition, the subcontractors "cooperated with each other, through Turner, agreeing to withhold legitimate bids for certain projects, while bidding legitimately for others that Turner informed them they would get."  *Id.* ¶ 141.  Donaldson Acoustics, which was awarded all three of the jobs on which Nastasi bid, "was not only complicit" in the scheme, but also paid bribes in order to get the work.  *Id.* ¶ 142.  In addition, Nastasi alleges that Eurotech, another subcontractor, agreed to submit a losing bid for the drywall job at 120 Park Avenue, to help create the appearance of competitive bidding, in exchange for "Turner steer[ing] the concrete work at that site to Eurotech."  *Id.*  All told, Nastasi alleges that it lost out on approximately seven or eight bids on the 120 Park Project as a result of the scheme.  *Id.* ¶ 145.

Prompted by Nastasi's complaints and failure to pay bribes, Turner, the named Turner and Bloomberg executives, and the Subcontractor Defendants — defined in the Complaint as the "Enterprise" — "orchestrated a scheme to usurp [Nastasi's] valid contractual rights to perform work for Bloomberg pursuant to the 2010 Master Services Agreement" at 731 Lexington Avenue and to "drive [Nastasi] out of business altogether.  *Id.* ¶¶ 20, 156.  In particular, on April 22, 2015, Nastasi was notified of a Stop Work Order, purportedly from the Carpenter's Union, stating that Nastasi was no longer authorized to perform work due to a failure to pay union dues. *Id*. ¶¶ 18, 160; *see also* Pl.'s Opp'n 7.  Despite Nastasi's claims that it had no knowledge of the Stop Work Order and that it was ready, willing, and able to work, Bloomberg informed Nastasi that same day that it could not perform any more work for Bloomberg and installed Eurotech in

its place.  Compl. ¶ 160-61.  According to Nastasi, Eurotech paid bribes to a Bloomberg executive, Paulino, and explicitly told Nastasi that "you've got to take care of Javier Paulino in order to keep those jobs." *Id.* ¶ 169.  The next day, Nastasi reiterated that the Union had not ordered it to stop work, but a Bloomberg executive sent Nastasi a letter purporting to terminate the contract pursuant to a provision of the 2005 Services Agreement.  *Id.* ¶ 164.

On April 25, 2015, Nastasi responded, reiterating that it was "ready, willing and able to fulfill all of its contractual obligations," and notifying Bloomberg that the termination pursuant to the 2005 Services Agreement was ineffective because the 2010 Master Services Agreement had superseded the 2005 Agreement.  *Id*. ¶ 165.  On April 29, 2015, a different Bloomberg executive sent another letter terminating the contract pursuant to the 2010 Master Services Agreement, using the Stop Work Order as a pretext.  *Id*. ¶ 166.  Nastasi alleges that Eurotech was also in on the scheme, conspiring to steal Nastasi's employees by paying their union wages, dues, and benefits from April 22 to 24, 2015, prior to the purported termination.  *Id*. ¶ 168. Nastasi maintains that the Stop Work Order was fabricated by the Enterprise as part of its conspiracy to destroy Nastasi.  *Id.* ¶ 160.  On January 31, 2018, according to Nastasi, the Carpenters' Union confirmed that the Stop Work Order had been fraudulent, stating that, "[s]o that there will be no misunderstanding, there was no stop work order, shutdown, or withdrawal of labor for the relevant time periods . . . since [the Union] did not receive such a notice from the Funds."  *Id*. ¶¶ 172-73.

Nastasi began to "spiral downward," as its labor supply was siphoned off by Eurotech and Donaldson Acoustics and its contracts were cancelled.  *Id.* ¶ 175-76.  After Turner arranged for Nastasi to be "improperly terminated" from several non-Bloomberg jobs at which Turner was the general contractor, Turner refused to pay Nastasi approximately $6.5 million that it was

owed.  *Id.* ¶ 176.  In addition, the reputational harm due to the lost contracts with Bloomberg and

the fraudulent Stop Work Order caused Nastasi to lose extensive existing business, resulting in

approximately $80 million in lost contracts.  *Id.* ¶ 178.  Then, on December 11, 2018, the

Manhattan District Attorney's Office announced the indictment of various Bloomberg and

Turner executives, including several of the Individual Defendants in this action.  *Id.* ¶ 21.  In its

press release announcing the indictments, the DA's office described a "massive, years-long

kickback scheme" and a "bid-rigging and commercial bribery conspiracy," that was "exactly the

type of case that our Rackets Bureau was created a hundred years ago to bring."  *Id.* ¶¶ 22, 91.

Ultimately, over a dozen people and corporations pleaded guilty and paid $5.5 million in

restitution.  *Id.* ¶ 91.[3]

## STANDARDS OF REVIEW

In evaluating a motion to dismiss pursuant to Rule 12(b)(6), a court must accept all facts

set forth in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *See,*

*e.g.*, *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008).  A claim will

survive a Rule 12(b)(6) motion, however, only if the plaintiff alleges facts sufficient "to state a

claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

---

[3]     Although not ultimately relevant here, this is not the first suit that Nastasi filed in this
Court based on these allegations.  Nastasi filed an earlier suit alleging the same claims on
December 31, 2018.  *See Nastasi & Assocs., Inc. v. Bloomberg, L.P.*, No. 18-CV-12361 (JMF)
(S.D.N.Y.).  The Court dismissed that suit for lack of Article III standing and pursuant to Rule 17
of the Federal Rules of Civil Procedure.  *See Nastasi & Assocs., Inc. v. Bloomberg, L.P.*, No. 18-
CV-12361 (JMF), 2020 WL 1166055 (S.D.N.Y. Mar. 11, 2020).  In light of an intervening
change in the law, the Second Circuit vacated the Court's decision on standing and remanded for
further proceedings.  *See Nastasi & Assocs., Inc. v. Bloomberg, L.P.*, 843 F. App'x 413 (2d Cir.
2021) (summary order).  On remand, the Court reaffirmed its alternative holding, dismissing
pursuant to Rule 17.  *See Nastasi & Assocs., Inc. v. Bloomberg, L.P.*, No. 18-CV-12361 (JMF),
2021 WL 3541153 (S.D.N.Y. Aug. 11, 2021).  While the prior case was on appeal, Nastasi filed
this suit and revived it after the Court's decision on remand.

(2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).  To survive a motion to dismiss, a plaintiff must show "more than a sheer possibility that a defendant has acted unlawfully," *id.*, and cannot rely on mere "labels and conclusions" to support a claim, *Twombly*, 550 U.S. at 555.  If the plaintiff's pleadings "have not nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Id.* at 570.

In general, there is no heightened pleading standard in antitrust or RICO cases and, at the pleading stage, a plaintiff need only "raise a reasonable expectation that discovery will reveal evidence of illegality." *Wacker v. JP Morgan Chase & Co.*, 678 F. App'x 27, 30 (2d. Cir. 2017) (summary order) (quoting *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013)) (antitrust); *Hecht v. Com. Clearing House, Inc.*, 897 F.2d 21, 26 n.4 (2d Cir. 1990) (RICO).  That said, because "the mere assertion of a RICO claim has an almost inevitable stigmatizing effect on those named as defendants," and since liability premised on such claims carries with it the threat of treble damages and attorney's fees, civil RICO has often been referred to as the "litigation equivalent of a thermonuclear device," and courts carefully scrutinize any such claims. *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 655 (S.D.N.Y. 1996) (citations omitted), *aff'd*, 113 F.3d 1229 (2d Cir. 1997); *see also Gutterman v. Herzog*, No. 20-CV-1081 (AMD) (LB), 2020 WL 6728787, at *3 (E.D.N.Y. Nov. 16, 2020) (citing cases).  At the same time, courts must take care not to interpret civil RICO narrowly, because "the RICO statute provides that its terms are to be 'liberally construed to effectuate its remedial purpose,'" *Boyle v. United States*, 556 U.S. 938, 944 (2009) (quoting 19 U.S.C. § 1961); *see also Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 499 (1985).  Similarly, "in antitrust

cases, the Supreme Court has stated that 'dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly.'" *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) (quoting *Hosp. Bldg. Co. v. Trs. Of Rex Hosp.*, 425 U.S. 738, 746 (1976)). Nevertheless, a court must be mindful that "proceeding to antitrust discovery can be expensive," *Twombly*, 550 U.S. at 558, and "[i]t is improper 'to assume that the plaintiff can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged,'" *Todd*, 275 F.3d at 198 (quoting *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983)); *see also Twombly*, 550 U.S. at 558 ("[A] district court must retain the power to insist upon specificity in pleading before allowing a potentially massive factual controversy to proceed.").

## DISCUSSION

Nastasi brings antitrust claims pursuant to the Sherman Act and its New York equivalent, the Donnelly Act, against all Defendants; RICO and RICO conspiracy claims against all Defendants other than Bloomberg; and state-law claims for negligent supervision and retention against Bloomberg and Turner. Defendants move to dismiss all claims, arguing that they are time barred, that Nastasi does not have standing to bring the antitrust or RICO claims, and that the allegations in the Complaint fail to state a claim under the relevant statutes. For the reasons that follow, the Court rejects Defendants arguments, except in two narrow respects.

### A. Statutes of Limitations

Defendants first move to dismiss all claims on the ground that they are time barred. ECF No. 57 ("Defs.' Mem."), at 8-10. Ordinarily, a statute of limitations is "an affirmative defense that must be raised in the answer." *Ellul v. Congregation of Christian Bros.*, 774 F.3d 791, 798 n.12 (2d Cir. 2014). But "a statute of limitations defense may be decided on a Rule 12(b)(6)

motion if the defense appears on the face of the complaint." *Id.* (citing *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008)). In this case, Nastasi's claims are subject to either a three- or four-year statute of limitations, *see* 15 U.S.C. § 15b (federal antitrust); N.Y. Gen. Bus. L. § 340(5) (state antitrust); *Zirvi v. Flatley*, 838 F. App'x 582, 585 (2d Cir. 2020) (summary order) (civil RICO); *Vasta v. Super Stop & Shop #0509*, No. 14-CV-3287 (ER), 2016 WL 5720772, at *4 (S.D.N.Y. Sept. 29, 2016) (negligent retention and supervision), and Nastasi's allegations concern conduct that largely occurred before 2015 (when Nastasi alleges that it "stopped bidding on Bloomberg projects altogether"), Compl. ¶¶ 147-48. Yet the case was not filed until July 14, 2020, more than four years after the relevant conduct.

Those facts may ultimately prove fatal to Nastasi's claims, but the Court cannot and does not dismiss on that ground at this stage of the litigation. It is well established that the running of a statute of limitations will be tolled if a plaintiff can show that the defendant fraudulently concealed its wrongdoing or the existence of the cause of action. *Pinaud v. Cnty. of Suffolk*, 52 F.3d 1139, 1157 (2d Cir. 1995). To benefit from this rule, a plaintiff must show that "(1) the defendant wrongfully concealed material facts relating to defendant's wrongdoing; (2) the concealment prevented plaintiff's discovery of the nature of the claim within the limitations period; and (3) plaintiff exercised due diligence in pursuing the discovery of the claim during the period plaintiff seeks to have tolled." *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 157 (2d Cir. 2012) (internal quotation marks omitted). "The burden rests squarely on the party pleading fraudulent concealment, and courts require particularity in pleading fraudulent concealment." *In re Nine W. Shoes Antitrust Litig.*, 80 F. Supp. 2d 181, 192 (S.D.N.Y. 2000); *see also Zirvi*, 858 F. App'x at 585 ("[P]laintiffs must plead the elements of fraudulent concealment with particularity.").

Although the question is a close one, the Court concludes that, measured against these standards, Nastasi's claims cannot be dismissed at this stage of the litigation on this ground. For starters, "bid-rigging and price-fixing conspiracies are deemed self-concealing," so Nastasi "is not required to show defendants took independent affirmative steps to conceal their conduct." *Nine W. Shoes*, 80 F. Supp. 2d at 193 (citing *State of New York v. Hendrickson Bros.*, 840 F.2d 1065, 1083 (2d Cir. 1988)). Nevertheless, Nastasi does allege additional affirmative acts of concealment. For example, Nastasi alleges that, when it raised questions about losing bids at the 120 Park Avenue Project, Defendants provided false explanations, telling Nastasi that Donaldson Acoustics had been lowest bidder when it was not, Compl. ¶¶ 130-31, and that Donaldson Acoustics was awarded a contract at 120 Park Avenue because Douglas Donaldson was married to the niece of a Bloomberg executive, *id.* ¶ 144; *see also id.* ¶¶ 193-95 (alleging that Defendants "affirmatively and fraudulently concealed their unlawful scheme, course of conduct and conspiracy from Nastasi and went to great lengths to create the appearance of a competitive market for interior construction projects, by engaging in a bidding process where no such legitimate competitive bidding market existed").

Additionally, the Complaint contains sufficient allegations to satisfy the second and third elements. *See id.* ¶ 195 ("Despite its diligent efforts, which included seeking meetings with Bloomberg and Turner compliance personnel and outside counsel, Plaintiff was unaware of Defendants' fraudulent, anti-competitive scheme and could not have discovered Defendants' fraudulent activities or concealment of their scheme."); *see also id.* ¶ 200 ("Bloomberg and Turner claim that they were unable to detect the wrongful conduct being carried out *by their own employees* as late as October, 2017" (emphasis added)). To be sure, Defendants make forceful arguments that Nastasi knew of the alleged scheme no later than 2011, when it confronted some

13

of the alleged participants, or 2015, when it stopped bidding on Bloomberg projects altogether.
*See* ECF No. 75 ("Defs.' Reply"), at 2 (citing Compl. ¶¶ 127, 129-30, 138, 147-48).  But these
arguments turn on factual issues that the Court cannot resolve on a motion to dismiss.  *See, e.g.*,
*BPP Illinois, LLC v. Royal Bank of Scotland Grp. PLC*, 603 F. App'x 57, 59 (2d Cir. 2015)
(summary order) (holding that it was "premature" to reject a fraudulent concealment argument
on a motion to dismiss); *see also, e.g., Nine W. Shoes*, 80 F. Supp. 2d at 193 (finding that
plaintiffs had "sufficiently alleged due diligence" where the complaint contained allegations
similar to those here); *Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 700 F. Supp. 2d 378, 400
(S.D.N.Y. 2010) ("Resolution of a claim of fraudulent concealment so as to toll the statute of
limitations is intimately bound up with the facts of the case and is thus not properly decided on a
motion to dismiss."); *In re Issuer Plaintiff Initial Pub. Offering Antitrust Litig.*, No. 00-CV-7804
(LMM), 2004 WL 487222, at *5 (S.D.N.Y. Mar. 12, 2004) ("[B]ecause this is a motion to
dismiss, the Court must accept Plaintiffs' allegations as true, and Plaintiffs allege that they had
no knowledge of the facts underlying their cause of action . . . and, due to the self-concealing
nature of the price-fixing scheme, could not have reasonably discovered such facts").[4]

## B.  Antitrust Claims

Next, Defendants move to dismiss Nastasi's antitrust claims, which are brought under the
Sherman Act and its New York State equivalent, the Donnelly Act.  *See, e.g., Nat'l Gear &
Piston, Inc. v. Cummins Power Sys., LLC*, 861 F. Supp. 2d 344, 370 (S.D.N.Y. 2012) ("The
standard for a well-pleaded Donnelly Act claim is the same as a claim under Section 1 of the

---

[4]      In light of the Court's conclusion that Nastasi adequately alleges fraudulent concealment,
it need not and does not address Nastasi's other responses to Defendants' timeliness arguments.

Sherman Act.").  Defendants argue that Nastasi lacks antitrust standing and that the Complaint

fails to state an antitrust claim.  The Court will address each argument in turn.

### 1.  Antitrust Standing

Although Section 4 of the Clayton Act authorizes "any person who [is] injured in his

business or property by anything forbidden in the antitrust laws" to bring suit for treble damages,

15 U.S.C. § 15, the Supreme Court has narrowed this grant of authority, clarifying that

"Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that

might conceivably be traced to an antitrust violation," *Associated Gen. Contractors of*

*California, Inc.*, 459 U.S. at 534 ("*AGC*").  Instead, only a plaintiff that can establish "antitrust

standing" is permitted to bring a claim under Section 4.  *See Gatt Commc'ns, Inc. v. PMC*

*Assocs., L.L.C.*, 711 F.3d 68, 75-76 (2d Cir. 2013).  A plaintiff seeking to establish antitrust

standing must "plausibly allege (a) that it suffered a special kind of antitrust injury, and (b) that it

is a suitable plaintiff to pursue the alleged antitrust violations and thus is an efficient enforcer of

the antitrust law."  *Id.* at 76 (citations and internal quotation marks omitted).

### a.  Antitrust Injury

The first requirement, that a plaintiff has suffered an "antitrust injury," is designed to

"ensure[] that the harm claimed by the plaintiff corresponds to the rationale for finding a

violation of the antitrust laws in the first place" and to "prevent[] losses that stem from

competition from supporting suits by private plaintiffs."  *Atl. Richfield Co. v. USA Petroleum*

*Co.*, 495 U.S. 328, 342 (1990).  The Second Circuit "employ[s] a three-step process for

determining whether a plaintiff has sufficiently alleged an antitrust injury."  *Gatt*, 711 F.3d at 76.

As the *Gatt* Court explained:

> First, the party asserting that it has been injured by an illegal anticompetitive
> practice must identify the practice complained of and the reasons such a practice

is or might be anticompetitive.  Next, we identify the actual injury the plaintiff alleges.  This requires us to look to the ways in which the plaintiff claims it is in a worse position as a consequence of the defendant's conduct.  Finally, we compare the anticompetitive effects of the specific practice at issue to the actual injury the plaintiff alleges.

*Id*. (internal citations and quotation marks omitted) (cleaned up); *see IQ Dental Supply, Inc. v. Henry Schein, Inc*., 924 F.3d 57, 63-65 (2d Cir. 2019) (applying *Gatt*'s "three-part test").

Here, there is no real dispute that Nastasi satisfies the first two prongs of the *Gatt* test: The Complaint alleges that Defendants engaged in a bid-rigging scheme — a category of restraint that courts have long held to be unlawful because of its "pernicious effect on competition and lack of any redeeming virtue," *United States v. Aiyer*, 33 F.4th 97, 119 (2d Cir. 2022) (quoting *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 289 (1985)) — and that Nastasi was injured "in its business or property, amounting to at least tens of millions of dollars, in that it engaged in and lost bidding opportunities that were manipulated by the [Defendants], foreclosed from the New York Region market for interior construction services, and lost its business," Compl. ¶ 212.  Instead, Defendants contend that Nastasi's claim fails the third prong because its injuries are not "of the type the antitrust laws were intended to prevent and that flow from that which makes or might make defendants' acts unlawful."  *Gatt*, 711 F.3d at 76 (citation omitted).  Indeed, Defendants contend that the facts and claims in this case are "nearly identical" to those in *Gatt* and that the Second Circuit's decision in that case — rejecting antitrust claims on antitrust standing grounds — "bars Nastasi from establishing an antitrust injury as a matter of law."  Defs.' Mem. 11-12; *see also* Defs.' Reply 5-6.

The Court is unpersuaded.  In *Gatt*, the plaintiff Gatt Communications, Inc. ("Gatt") was a licensed dealer of radios made by Vertex Standard USA, Inc. ("Vertex").  *Gatt*, 711 F.3d at 72. Gatt's dealer agreement required it to keep PMC Associates, Inc. ("PMC"), a sales

16

representative, informed of its sales efforts and provided that "failure to cooperate with PMC could result in termination of the [d]ealer [a]greement." *Id*. Gatt admittedly participated in, and profited from, a bid-rigging scheme run by PMC for several years, but it eventually became "frustrated with the share of government contracts allocated to it under the scheme" and "broke ranks and independently set and submitted" the lowest bid. *Id*. at 73. PMC learned of the "rogue bid" and, after Gatt rejected its offer of a payment to withdraw the bid, contacted Vertex, which, in turn, "exercised its 'option' to terminate Gatt's . . . dealership, effective thirty days later." *Id*. Gatt alleged "that PMC's conduct in recommending that Vertex terminate its contract with Gatt . . . violated the antitrust laws because that conduct was intended to perpetuate an illegal and anticompetitive bid-rigging scheme." *Id*. at 77.

On appeal, the Second Circuit held that Gatt's claims failed for lack of antitrust standing. For starters, the Court observed that it was "not clear that the underlying bid-rigging arrangement" was "prohibited by the antitrust laws" because it involved "only one brand of commercial land mobile radios" and no allegation "that the brand constitute[ed] a stand-alone market." *Id*. "Restrictions on intrabrand competition," the Court explained, "can actually enhance market-wide competition by fostering vertical efficiency and maintaining the desired quality of a product." *Id*. (cleaned up). More relevant for present purposes, the Court continued:

> [E]ven assuming that the alleged bid-rigging scheme is unlawful, it is so only because of the harm it may cause — increased prices — to purchasers of Vertex products. Gatt's lost revenue resulting from the Vertex termination, however, is not an injury that flows from that which makes bid-rigging unlawful. Gatt has not been forced to pay higher prices for a product, as customers who are victimized by price-fixing schemes might. Instead, Gatt's injuries flow from its participation and then exclusion from a distribution network that, allegedly, featured intra-brand price-fixing, and in which it had no right *ab initio* to participate. Even if the antitrust laws seek to prevent Vertex and PMC's alleged activities because of resulting harm to *competition*, these laws are not concerned with injuries to *competitors* such as Gatt resulting from their participation or exile from such schemes.

*Id.* (citations omitted); *see* Defs.' Mem. 11-12.  To Defendants, the upshot of this analysis is that "an excluded competitor may not obtain redress" for an alleged bid-rigging scheme "through Section 1 of the Sherman Act or the Donnelly Act."  Defs.' Mem. at 12; *see also* Defs.' Reply 6.

In the Court's view, Defendants overstate the holding of *Gatt*.  The Second Circuit did not hold, as a categorical matter, that "lost profits cannot constitute an antitrust injury from a price-fixing scheme, and that the only cognizable injury is the payment of inflated prices." *DNAML Pty, Ltd. v. Apple Inc.*, 25 F. Supp. 3d 422, 429 (S.D.N.Y. 2014) (rejecting that argument).  Instead, the Circuit characterized Gatt's injury as "lost revenue resulting from the Vertex termination" and found that, as a result, it was "not an injury that flows from that which makes bid-rigging unlawful."  *Gatt*, 711 F.3d at 77; *see also, e.g.*, *Arcesium, LLC v. Advent Software, Inc.*, No. 20-CV-04389 (MKV), 2021 WL 1225446, at *8 (S.D.N.Y. Mar. 31, 2021) (finding no antitrust standing at the third step because, as "in *Gatt*, any harms that flow from [contract] termination are not cognizable as antitrust injuries because Defendants were exercising their express contractual right").  The Court continued, noting that the customers "forced to pay higher prices for a product" *would* have a valid antitrust injury in the circumstances presented, *Gatt*, 711 F.3d at 77, but the Court did not hold more generally that the customer of a bid-rigging conspiracy is the *only* party that may sustain an antitrust injury.

Indeed, the Second Circuit has explicitly recognized that "[c]ompetitors and consumers in the market where trade is allegedly restrained *are* presumptively the proper plaintiffs to allege antitrust injury," *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 158 (2d Cir. 2016) (emphasis added) (citation and internal quotation marks omitted), and has noted that "lost profits and overcharges" are "conceptually different measures" of damages for antitrust injuries, *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 689 (2d Cir. 2009); *see also Daniel v.*

18

*Am. Bd. of Emergency Med.*, 428 F.3d 408, 439 (2d Cir. 2005) ("This is not to suggest that a would-be competitor can never demonstrate standing to challenge an exclusionary scheme that prevents him from entering a market simply because he sues to recover profits that he otherwise would have earned.  Indeed, both the Supreme Court and this court have concluded to the contrary.").  Similarly, the Supreme Court has suggested, albeit in dicta, that "a contracting or subcontracting firm that refused to yield to the defendants' coercive practices and therefore suffered whatever sanction that coercion imposed . . . could maintain an [antitrust] action against the defendants."  *AGC*, 459 U.S. at 541 n.44; *see, e.g.*, *Willie McCormick & Assocs., Inc. v. Lakeshore Eng'g Servs., Inc.*, No. 12-CV-15460, 2015 WL 5093785 (E.D. Mich. Aug. 28, 2015).  Contrary to Defendants overbroad interpretation of *Gatt*, therefore, "[a] claim for lost profits can constitute a cognizable antitrust injury in the appropriate case."  *DNAML*, 25 F. Supp. 3d at 422; *see also Nirvana, Inc. v. Nestle Waters N. Am. Inc.*, 123 F. Supp. 3d 357, 370 (N.D.N.Y. 2015) ("Plaintiff's lost revenues are the type of injury that antitrust laws were intended to prevent."); Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, ¶ 348a (5th ed. 2022) ("[A] rival clearly has standing to challenge the conduct of rival(s) that is illegal precisely because it tends to exclude rivals from the market, thus leading to reduced output and higher prices.").[5]

This is such an "appropriate case."  *DNAML*, 25 F. Supp. 3d at 422.  Nastasi claims that it was harmed because the conspirators coordinated a bid-rigging scheme that excluded it from the market.  In addition, Nastasi plausibly alleges that the effect of the scheme was to reduce overall

---

[5]     To the extent that other district courts have adopted a broader reading of *Gatt* that precludes a competitor from ever establishing antitrust injury on the basis of lost profits, *see, e.g.*, *Yong Ki Hong v. KBS Am., Inc.*, 951 F. Supp. 2d 402, 418 (E.D.N.Y. 2013) ("In *Gatt Communications*, the court held that lost profits, though an economic injury, is simply not the type of injury that confers antitrust standing on a claimant."), this Court takes a different view.

competition.  *See* Compl. ¶ 96; *see Todd*, 275 F.3d at 213 ("An antitrust plaintiff must allege not only cognizable harm to herself, but an adverse effect on competition market-wide.").  Because Nastasi alleges that its injury "stems from a competition-*reducing* aspect or effect of the defendant[s'] behavior," *Atl. Richfield Co.*, 495 U.S. at 344, the injury is "of the type the antitrust laws were intended to prevent and that flows from that which makes or might make Defendants' acts unlawful," *Gatt*, 711 F.3d at 76; *see also PharmacyChecker.com, LLC v. Nat'l Ass'n of Boards of Pharmacy*, 530 F. Supp. 3d 301, 332 (S.D.N.Y. 2021) (finding antitrust standing where the plaintiff "allege[d] that it 'has now effectively been excluded from the market,' and that this has caused harm to its business"); *Stolow v. Greg Manning Auctions Inc.*, 258 F. Supp. 2d 236, 244 (S.D.N.Y. 2003) (finding antitrust standing where the plaintiff "allege[d] that he was personally injured by the . . . bid-rigging scheme" because "he lost his source of business," and "allege[d] injury to competition within the stamp trading industry as a whole"), *aff'd,* 80 F. App'x 722 (2d Cir. 2003); *Willie McCormick & Assocs., Inc.*, 2015 WL 5093785 (holding that "a competitor's loss may constitute antitrust injury where it stems from the competitor's exclusion from the market" and "stems from a competition-*reducing* aspect of the defendant's behavior"); *cf. Sell It Social, LLC v. Acumen Brands, Inc.*, No. 14-CV-3491 (RMB), 2015 WL 1345927, at *5 (S.D.N.Y. Mar. 20, 2015) (finding no antitrust standing where the plaintiff alleged "an adverse effect upon its individual business prospects" but "fail[ed] to allege an adverse effect on competition market-wide").  Accordingly, the Court concludes that Nastasi adequately alleges an antitrust injury.

### b. Efficient Enforcer

In addition to establishing an "antitrust injury," a private plaintiff must show that it is an "efficient enforcer of the antitrust laws" to establish antitrust standing. *Gatt*, 711 F.3d at 76. There are four factors that a court must consider as part of the "efficient enforcer" inquiry:

> (1) the directness or indirectness of the asserted injury; (2) the existence of more direct victims or the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the extent to which the claim is highly speculative; and (4) the importance of avoiding either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other.

*In re Am. Express Anti-Steering Rules Antitrust Litig.*, 19 F.4th 127, 138 (2d Cir. 2021) (cleaned up). "Directness in the antitrust context means close in the chain of causation," *Gatt*, 711 F.3d at 78, and courts "generally follow[] the first-step rule," meaning that there must be "some direct relation between the injury asserted and the injurious conduct alleged." *In re Am. Express*, 19 F.4th at 139-40 (internal quotation marks omitted). Ultimately, "the weight to be given the various factors will necessarily vary with the circumstances of particular cases." *Daniel*, 428 F.3d at 443. The purpose of the test is to determine "whether the putative plaintiff is a proper party to 'perform the office of a private attorney general' and thereby 'vindicate the public interest in antitrust enforcement.'" *Gatt*, 711 F.3d at 80 (quoting *AGC*, 459 U.S. at 542).

Weighing the factors here, the Court concludes that Nastasi is "a proper party" to pursue the alleged antitrust claims. In arguing otherwise, Defendants rest primarily on the contention that the Corporate Consumers, most notably Bloomberg, would be "superior" plaintiffs. *See* Defs.' Mem. 13.[6] Nastasi's "supposed injuries," they argue, "are far more remote and

---

[6]     Defendants do not challenge the third and fourth factors — until their reply brief, *see* Defs.' Reply 6-7, which is too late, *see, e.g.*, *Farmer v. United States*, No. 15-CV-6287 (ATM), 2017 WL 3448014, at *3 (S.D.N.Y. Aug. 10, 2017) ("Courts have repeatedly held that arguments raised for the first time in reply briefs are waived." (collecting cases)). In any event, the Supreme Court has observed (albeit in the Lanham Act context) that these two factors are

conjectural than the losses suffered by the Corporate Consumers, who [Nastasi] alleges were directly forced to pay millions in inflated prices."  *Id.* at 13 (internal quotation marks omitted).  But Nastasi plausibly alleges that it was directly injured by the anticompetitive conduct because it was excluded from the market.  *See* Compl. ¶¶ 18-19 (alleging that the "conspirators coordinated a response for the purpose of destroying [Nastasi's] business"), *id.* ¶ 211-12; *cf. IQ Dental*, 924 F.3d at 65-66 (finding that the plaintiff's injury was "too indirect" to support antitrust standing where the plaintiff "was not the target of annihilation; it was simply collateral damage").  And "the relevant question is whether 'the plaintiff is an entity most motivated by self-interest, not *the* entity most motivated by self-interest.'"  *In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712, 725 (S.D.N.Y. 2017) (quoting *In re DDVAP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 688 (2d Cir. 2009)).  Thus, although "Defendants are correct that there is another class of persons 'potentially inclined' to enforce the antitrust claims here[,] . . . [t]heir presence . . . does not necessarily destroy [Nastasi's] standing."  *In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d at 725; *see also DDVAP*, 585 F.3d at 688 ("Inferiority to other potential plaintiffs can be relevant, but it is not dispositive." (internal quotation marks omitted)).  Moreover, Nastasi's allegations raise doubts about whether Bloomberg in particular is properly motivated to vindicate the public's interest given the alleged complicity of its senior executives in the scheme.  *See* Pl.'s Opp'n 20; *cf. Gatt*, 711 F.3d at 79 ("We see no reason to expect the

---

"'problematic' and that 'potential difficulty in ascertaining and apportioning damages is not . . . an *independent* basis for denying standing where it is adequately alleged that a defendant's conduct has proximately injured an interest of the plaintiff's that the statute protects.'"  *DNAML*, 25 F. Supp. 3d at 430 (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 135 (2014)).  Moreover, Nastasi's injury, as alleged, is not particularly speculative; nor does it raise the specter of duplicative or difficult-to-apportion damages.  Nastasi alleges that, due to market manipulation, it lost approximately seven or eight specific contracts for which it was the lowest bidder.  Compl.¶ 147; Pl.'s Opp'n 21.

State agencies to lack the incentive or the ability to seek relief, for example, through the courts, or through administrative proceedings.").  Accordingly, the Court finds that Nastasi is an efficient enforcer of the antitrust laws.

### 2.  Failure to State an Antitrust Claim

Separately, Defendants contend that the Complaint fails to state an antitrust claim "as a substantive matter" because the allegations do not establish that the alleged scheme was an unlawful restraint of trade under either the *per se* rule or the rule of reason.  *See* Defs.' Mem. 13-18.  Section 1 of the Sherman Act states that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . . is declared to be illegal."  15 U.S.C. § 1.  "Thus, according to the statute, a plaintiff claiming a § 1 violation must first establish a combination or some form of concerted action between at least two legally distinct economic entities."  *Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 542 (2d Cir. 1993).  Importantly, "[t]he ultimate existence of an 'agreement' under antitrust law . . . is a legal conclusion, not a factual allegation.  A plaintiff's job at the pleading stage, in order to overcome a motion to dismiss, is to allege enough facts to support an inference that a conspiracy actually existed."  *Mayor & City Council of Baltimore*, 709 F.3d at 135-36.

There are generally two ways to plausibly allege that a conspiracy actually existed.  "First, a plaintiff may . . . assert direct evidence that the defendants entered into an agreement in violation of the antitrust laws."  *Id.* at 36.  In the alternative, because "this type of 'smoking gun' can be hard to come by, especially at the pleading stage," a plaintiff may "present circumstantial facts supporting the *inference* that a conspiracy existed."  *Id.*  In that instance, however, the plaintiff must allege parallel conduct and "plus factors" or "additional circumstances . . . which,

when viewed in conjunction with the parallel acts, can serve to allow a fact-finder to infer a conspiracy." *Apex Oil Co. v. DiMaruo*, 822 F.2d 246, 253-54 (2d Cir. 1987); *see also Twombly*, 550 U.S. 544, 556-57 ("[A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice.  Without more, parallel conduct does not suggest conspiracy.").  Plus factors "may include: a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." *Mayor & City Council of Baltimore*, 709 F.3d at 136.  In addition, the existence of an ongoing government investigation, "when combined with parallel behavior, might permit a jury to infer the existence of an agreement." *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44, 55 (S.D.N.Y. 2016).  Importantly, at the motion to dismiss stage, a plaintiff "is not required to show . . . that the allegations suggesting agreement are more likely than not true or that they rule out the possibility of independent action." *In re Keurig Green Mt. Singleserve Coffee Antitrust Litig.*, 383 F. Supp.3d 187, 245 (S.D.N.Y. 2019) (internal quotation marks omitted).  Instead, the plaintiff need only "allege[] specific facts sufficient to plausibly suggest that the parallel conduct alleged was the result of an agreement" among the subcontractors.  *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 323 (2d Cir. 2010).

Next, to state a claim, a plaintiff must "demonstrate that the agreement constituted an unreasonable restraint of trade either per se or under the rule of reason." *Cap. Imaging Assocs., P.C.*, 996 F.2d at 542; *accord United States v. Apple, Inc.*, 791 F.3d 290, 320-21 (2d Cir. 2015) ("Although the Sherman Act, by its terms, prohibits every agreement 'in restraint of trade,' the Supreme Court has long recognized that Congress intended to outlaw only unreasonable restraints.").  Most antitrust claims are assessed under the rule of reason, which requires a case-

by-case market analysis. But some forms of restraint "have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit, that they are deemed unlawful *per se*." *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997). For these practices, a "case-by-case analysis is unnecessary" because, "by their nature[, they] have a substantial potential to unreasonably restrain competition." *Apple*, 791 F.3d at 321 (quoting *FTC v. Sup. Ct. Trial Lawyers Ass'n*, 493 U.S. 411, 433 (1990)). The "'archetypal example' of a *per se* unlawful restraint on trade" is a horizontal price-fixing conspiracy; by contrast, "vertical restraints — including those that restrict prices — should generally be subject to the rule of reason." *Id*. (quoting *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647 (1980)); *see, e.g.*, *Anderson News, LLC v. American Media, Inc.*, 680 F.3d 162, 182 (2d Cir. 2012) (explaining that "horizontal" agreements are "between competitors at the same level of the market structure" and "vertical" agreements involve "combinations of persons at different levels of the market structure, [such as] manufacturers and distributors"). Significantly for present purposes, "bid rigging . . . has been classified by courts as a per se violation" and, in such cases, "the Sherman Act will be read as simply saying: 'An agreement among competitors to rig bids is illegal.'" *United States v. Koppers Co.*, 652 F.2d 290, 294 (2d Cir. 1981).

Once again, the issue is a close one, but the Court concludes that, measured against these standards, Nastasi states plausible antitrust claims against everyone other than the Bloomberg Defendants. For starters, the Complaint alleges a "classic hub-and-spoke conspiracy" with Turner and Nigro (together, the "Turner Defendants") as the "hub" and the Subcontractor Defendants as the "spokes." Pl.'s Opp'n 22; *see* Compl. ¶¶ 203-08; *see also, e.g.*, *Apple*, 791 F.3d at 314 (explaining that a hub-and-spoke conspiracy includes both horizontal and vertical agreements and exists when "an entity at one level of the market structure, the 'hub,' coordinates

an agreement among competitors at a different level, the 'spokes'").  Additionally, the objective

of the hub-and-spoke conspiracy — bid rigging or horizontal price fixing — is a *per se*

unreasonable restraint of trade.  *Koppers*, 652 F.2d at 294; *see* Compl. ¶¶ 203-04.  Because that

is the case, all participants in the conspiracy are liable, even if, in its individual role, a

conspirator engaged only in "vertical conduct" that would otherwise be assessed under the rule

of reason.  *Apple*, 791 F.3d at 321-22; *see also United States v. General Motors Corp.*, 384 U.S.

127, 140 (1966).[7]

Finally, Nastasi also alleges "plus factors" sufficient to "suggest that the parallel conduct

alleged was the result of an agreement" among the subcontractors.  *Starr*, 592 F.3d at 323.

First, Nastasi alleges that the conspirators had a "[m]otive to conspire," which "may be inferred

where the parallel action taken by defendants had the effect of creating a likelihood of increased

profits."  *Anderson News, L.L.C. v. Am. Media, Inc.*, 123 F. Supp. 3d 478, 500 (S.D.N.Y. 2015),

*aff'd,* 899 F.3d 87 (2d Cir. 2018) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S.

253, 287 (1968)).  In particular, Nastasi plausibly alleges that the bid-rigging scheme increased

the Subcontractor Defendants' profits.  *See, e.g.*, Compl. ¶ 71.  Second, Nastasi alleges actions

that "were against the apparent economic self-interest of the alleged conspirators," *Mayor & City*

*Council of Baltimore*, 709 F.3d at 136, namely that the subcontractors bid "artificially high" —

that is, too high to prevail in a non-distorted market — because they were "not competing on

price," Compl. ¶ 71; *see, e.g.*, *First Nat. Bank of Ariz.*, 391 U.S. at 286-87 (finding a "tacit

agreement" where "the imposition of the restrictions would be feasible only if adhered to by all

distributors").  Finally, "[t]he mere existence of [government] investigations is a circumstance

---

[7]      In light of that conclusion, the Court need not and does not address the parties' arguments
with respect to the rule of reason.

that, 'when combined with parallel behavior, might permit a jury to infer the existence of an agreement.'" *Alaska Elec. Pension Fund*, 175 F. Supp. 3d at 55 (quoting *Mayor & City Council of Baltimore*, 709 F.3d at 136 n.6). Here, the Complaint alleges much more than a government *investigation* — it points to multiple indictments and "over a dozen guilty pleas and millions in restitution." Pl.'s Opp'n 25; *see* Compl. ¶¶ 30, 90-92; *see also* Indictment; ECF No. 74-1 (New York Times article reporting on the investigation). In short, the allegations in the Complaint support the inference that the Subcontractor Defendants and the Turner Defendants engaged in a hub-and-spoke style conspiracy that had as its objective a bid-rigging scheme, a *per se* violation of the antitrust laws.

In arguing otherwise, Defendants contend that the Complaint fails to adequately allege agreement among the "spokes" — that is, a horizontal agreement. Defs.' Mem. 15-16. The Court disagrees. For example, Nastasi alleges that "[t]he Subcontractor Defendants cooperated with each other, through Turner, agreeing to withhold legitimate bids for certain projects, while bidding legitimately for others that Turner informed that they would get." Compl. ¶ 141; *see also id.* ¶ 72 ("In some instances, the pre-determined winning subcontractor would communicate the winning subcontractor bid amount to the pre-determined losing subcontractor so that they would know exactly what number to bid to make sure they were not the lowest bidder but also to be close enough to the winning number to create the appearance of a fair process."); *id.* ¶ 77 ("In these ways, among others, interior construction subcontractors acted in concert, directly and through Turner, to inflate prices to Corporate Consumers."). Moreover, Nastasi is not required to allege that the Subcontractors Defendants formally agreed to enter into a conspiracy with one another. Instead, "where parties to vertical agreements have knowledge that other market participants are bound by identical agreements, and their participation is contingent on that

knowledge, they may be considered participants in a horizontal agreement in restraint of trade." *Laumann v. Nat'l Hockey League*, 907 F. Supp. 2d 465, 486-87 (S.D.N.Y. 2012); *see also Apple*, 791 F.3d at 314 (describing a hub-and-spoke conspiracy as containing "a horizontal agreement among the spokes to adhere to the hub's terms, often because the spokes would not have gone along with the vertical agreements except on the understanding that the other spokes were agreeing to the same thing" (internal quotations marks omitted)).  The alleged bid-rigging scheme here depended on each subcontractor knowing that the others would be participating.

In sum, Nastasi states valid antitrust claims against the Turner Defendants and the Subcontractor Defendants.  By contrast, its antitrust claims against the Bloomberg Defendants — Bloomberg, Paulino, Francisco, Guzzone, Summerville, Smith, and Campana — fall short as a matter of law.  Indeed, as Defendants note, Nastasi does not allege Bloomberg to be "either a hub *or* a spoke [and] there is no claim that Bloomberg reached any agreement with any competitor or coordinated any agreements among competitors."  Defs.' Reply 7.  In fact, in the portion of its memorandum of law concerning the antitrust conspiracy, Nastasi conspicuously fails even to mention the Bloomberg Defendants.  *See* Pls.' Opp'n 22-29.  That failure is not surprising because Bloomberg was, after all, the primary victim of the purported bid-rigging scheme, harmed — on Nastasi's own account — to the tune of "millions of dollars of bid inflation." Compl. ¶ 24; *see* ECF No. 59 ("Bloomberg Mem."), at 5 ("It is perverse for Nastasi to claim that Bloomberg should be liable under [the] antitrust laws for bid rigging that inflated the cost of the contractors' work for Bloomberg by millions of dollars." (internal quotation marks omitted)). Whether or not it is inherently "implausible" to allege, as Nastasi does, that the victim of an antitrust scheme was also its perpetrator, *Rutolo v. Fannie Mae*, 933 F. Supp. 2d 512, 520 (S.D.N.Y. 2013); *cf. First Nat. Bank of Ariz.*, 391 U.S. at 287 (finding that where the plaintiff

28

was "unable to point to any benefits to be obtained by [the defendant], . . . the inference of

conspiracy . . . does not logically follow"); *see also* Areeda & Hovenkamp, ¶ 1414 ("[T]he

absence of benefit makes conspiracy unlikely, while its presence is consistent with an agreement

but does not prove it."), the fact is that Nastasi has no plausible account of how the Bloomberg

Defendants participated in the alleged antitrust violations.  Accordingly, Nastasi's antitrust

claims must be and are dismissed against the Bloomberg Defendants.

## C.  RICO Claims

As discussed, Nastasi also brings RICO and RICO conspiracy claims, alleging that

"Turner, the named Turner and Bloomberg executives, and the Subcontractor Defendants [were]

an association-in-fact criminal enterprise" (the purported "Enterprise"), operating for the purpose

of "carry[ing] out a massive multi-billion dollar bid-rigging scheme."  Compl. ¶¶ 20, 230.

RICO creates a private right of action for "[a]ny person injured in his business or property by

reason of a violation of Section 1962" of the statute."  18 U.S.C. § 1964(c).  Section 1962, in

turn, makes it "unlawful for any person employed by or associated with any enterprise engaged

in, or the activities of which affect, interstate or foreign commerce, to conduct or participate,

directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering

activity."  *Id.* § 1962(c).  Racketeering activity is defined to include a wide variety of criminal

offenses, including, as relevant here, wire fraud, mail fraud, commercial bribery, bank fraud, and

money laundering.  *Id.* § 1961(1); *see, e.g.*, *Empire Merchants*, 902 F.3d at 139.

Defendants move to dismiss these claims, arguing that the Complaint (1) does not allege

a cognizable RICO injury; (2) does not adequately plead the existence of a RICO enterprise;

(3) does not adequately plead the commission of RICO predicate acts; and (4) fails to adequately

plead a conspiracy to commit racketeering acts.  Defs.' Mem. 18-19.  In addition, many

Defendants filed individual supplemental memoranda arguing primarily that the Complaint does not adequately allege that they each committed at least two RICO predicate acts.  *See* ECF No. 61 ("Summerville & Smith Mem."); ECF No. 62 ("Turner Mem."); ECF No. 63 ("Eurotech & Devlin Mem."); ECF No. 66 ("Francisco Mem."); ECF No. 67 ("Donaldson Mem."); ECF No. 68 ("Campana Mem.").

The Court will address each issue in turn.

### 1. RICO Injury

To show injury "by reason of" a statutory violation, a civil RICO plaintiff must allege and ultimately prove that the violation was both a "but-for" *and* a "proximate cause" of its injury.  *See Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992); *Alix v. McKinsey & Co., Inc.*, 23 F.4th 196, 203 (2d Cir. 2022).  In this context, the term "[p]roximate cause requires some direct relation between the injury asserted and the injurious conduct alleged." *Empire Merchants*, 902 F.3d at 141 (internal quotation marks and alterations omitted); *see Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) ("When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries.").  Put differently, "a link that is too remote, purely contingent, or indirect is insufficient." *Empire Merchants*, 902 F.3d at 141 (internal quotation marks and alterations omitted).

Relying on *Anza* and *Empire Merchants*, Defendants argue that "independent, intervening factors could have accounted for [Nastasi's] failure to win the bid" and that there are "simply too many contingencies . . . to conclude that Nastasi's claimed injuries directly resulted from the alleged scheme." Defs.' Reply 14.  The Court is unpersuaded.  Nastasi alleges multiple, specific injuries that were proximately caused by the alleged Enterprise.  For example, Nastasi alleges

that members of the Enterprise improperly altered one of its bids, changing the bid from $800,000, the lowest bid, to $900,000, just above the "winning" bid.  Compl. ¶¶ 15, 123, 136 ("[H]ad Nastasi & Associate's bid not been adjusted, it would have obtained the work as the lowest bidder.").  In another example of direct harm, Nastasi alleges that the Enterprise fabricated a fraudulent Stop Work Order that it used to "usurp" Nastasi's "valid contractual rights to perform work for Bloomberg."  *Id.* ¶ 159.  Further, Nastasi alleges that Defendants' collusion prevented it from winning *specific contracts*.  *See id.* ¶¶ 124, 136, 143.  Taken together, these allegations suffice to allege RICO injury.  *See, e.g.*, *Stolow*, 258 F. Supp. 2d at 247 (finding "an adequate allegation of injury" where the RICO plaintiff "allege[d] that as a result of the illegal activities in violation of the RICO statute," including bid-rigging, the "plaintiff was driven out of business" (cleaned up)); *Willie McCormick & Assocs., Inc.*, 2015 WL 5093785, at *5 (finding proximate cause on a motion for reconsideration where the plaintiff alleged that the RICO defendants "engaged in a pattern of bribery and extortion with the effect of funneling . . . contract work away from [the p]laintiff and other honest (sub)contractors to the [d]efendants," rejecting its prior conclusion that the harm to the subcontractor was contingent on the harm suffered by the customer); *Morning Star Packing Co. v. SK Foods, L.P.*, No. 09-CV-0208 (KJM) (EFB), 2011 WL 4591069, at *6 (E.D. Cal. Sept. 30, 2011) (denying a motion to dismiss where the plaintiffs "allege[d] not only that the bribery scheme kept them out of the market generally but that they lost specific contracts they otherwise would have received").

Defendants' next claim, that "it is entirely plausible that Bloomberg balanced price considerations with other concerns (*e.g.*, work quality) when selecting a subcontractor," Defs.' Mem. 20-21, also fails to persuade.  For starters, the argument is premature, as the Court is obligated to accept Nastasi's well-pleaded allegations as true.  *See Alix*, 23 F.4th at 205 ("Of

course, [the defendant] might ultimately prove the existence of intervening factors, but that showing must await summary judgment or trial."); *Naples v. Stefanelli*, No. 12-CV-4460 (JS) (ARL), 2015 WL 541489, at *14 (E.D.N.Y. Feb. 7, 2015) (refusing to consider RICO defendants' alternative explanations for the plaintiff's harm on a motion to dismiss because "that is not what [p]laintiffs allege").  Nastasi specifically alleges that it would have won certain contracts absent the Enterprise's conduct, a factual allegation that, at this stage, the Court must accept as true.  *See, e.g.*, Compl. ¶ 147 (alleging that Nastasi lost "approximately seven or eight manipulated bids, all of which it should have won based on its competitive bid proposals as submitted").  Moreover, because the Enterprise, as alleged, included several high-ranking Bloomberg executives, Defendants' speculation about Bloomberg's true motives is unavailing. Similarly, Defendants' argument that "Nastasi does not even allege that Bloomberg was obligated to grant construction work to the lowest bidder," Defs,' Mem. 20, also fails because, as the Fifth Circuit has explained, a RICO plaintiff "need not show that the other party *would have been obliged* to confer a benefit, only that the other party *would have conferred* the benefit.  That [the defendant] retained discretion . . . does not prohibit [the plaintiff] from demonstrating that but for corruption, it would have continued to receive awards," *Gil Ramirez Grp., L.L.C. v. Houston Indep. Sch. Dist.*, 786 F.3d 400, 410 (5th Cir. 2015).

Finally, Defendants argue that "the direct victim of the alleged RICO scheme is Bloomberg" and that Bloomberg "is a far better plaintiff to vindicate any purported RICO injuries."  Defs.' Mem. 20.  There is some force to that argument, but, as Nastasi notes, a RICO scheme may have more than one intended victim, and the Complaint alleges that one of the goals of the Enterprise was "to drive out honest subcontractors like [Nastasi] to control the market, and then to drive [Nastasi] out of business altogether."  Pl.'s Opp'n 36; Compl. ¶ 156; *see Baisch v.*

*Gallina*, 346 F.3d 366, 375 (2d Cir. 2003) ("No precedent suggests that a racketeering enterprise may have only one 'target,' or that only a primary target has standing."); *accord In re Refco Inc. Sec. Litig.*, 826 F. Supp. 2d 478, 536 (S.D.N.Y. 2011) ("An injury can be direct even if the plaintiff is not the only target of the defendant's misconduct."). Moreover, as discussed above, given the allegations of wrongdoing within Bloomberg, there is reason to believe that it would not be "a more appropriate alternative plaintiff." *Alix*, 23 F.4th at 208. Defendants counter that Nastasi provides no factual allegations to support "a plausible inference that the purpose of the [Enterprise] was to harm Nastasi, as opposed simply to win bids for the parties involved." Defs.' Reply 15. The factual allegations on that score are admittedly somewhat thin, but Nastasi plausibly alleges that, in connection with the 731 Lexington Project, the Enterprise manufactured the fraudulent Stop Work Order in order to damage Nastasi's business in retaliation for its refusal to participate in the bid-rigging scheme at 120 Park Avenue and because of the red flags it had attempted to raise with Bloomberg. Compl. ¶¶ 148-51, 154-63. These factual allegations, taken as true, are sufficient to render plausible Nastasi's allegation that one of the purposes of the Enterprise was to destroy its business.

## 2. RICO Enterprise

Next, Defendants contend that Nastasi fails to plausibly allege the existence of a RICO enterprise. Defs' Mem. 21-23. The RICO statute defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "An association-in-fact enterprise," which Nastasi alleges here, "'is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.'" *D. Penguin Bros. v. City Nat. Bank*, 587 F. App'x 663, 667 (2d Cir. 2014) (summary order)

(quoting *Boyle*, 556 U.S. at 945).  "The concept of an association-in-fact is protean, and, as such, variability is invited by the statutory language and the Supreme Court's construction of that language."  *D'Addario v. D'Addario*, 901 F.3d 80, 100 (2d Cir. 2018).  Nevertheless, a plaintiff pleading an association-in-fact must establish "three structural features: (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose."  *D. Penguin Bros.*, 587 F. App'x at 667 (quoting *Boyle*, 556 U.S. at 946).

"Proof that several individuals, independently and without coordination, engaged in a pattern of crimes listed as RICO predicates, is not enough to show that the individuals were members of an enterprise."  *D'Addario*, 901 F.3d at 101 (quoting *Boyle*, 556 U.S. at 947 n.4). Accordingly, a so-called "rimless hub-and-spoke conspiracy," where "each defendant is alleged to have a relationship with a central figure, but the defendants are not all alleged to be connected in some overarching way (such as by an agreement to further a single design or purpose)," is not an association-in-fact.  *Id.*; *see also id.* at 102 (finding no association-in-fact where the complaint alleged six separate fraudulent schemes but did not establish that the defendants "acted with a sufficiently common purpose," or were "even aware of" each other); *Dynarex Corp. v. Farrah*, No. 18-CV-7072 (VB), 2019 WL 2269838, at *3 (S.D.N.Y. May 28, 2019) (finding no association-in-fact where the complaint alleged that the "racketeering activity committed by the Defendants . . . involved separate — albeit related — schemes with various participants"); *Moss v. BMO Harris Bank, N.A.*, 258 F. Supp. 3d 289, 303 (E.D.N.Y. 2017) (finding no association-in-fact where the plaintiff "assert[ed] a rimless hub and spokes relationship" and did not allege "that the participants in the association shared a common fraudulent purpose").  On the other hand, courts have held that a "hub-and-spoke conspiracy that d[oes] have a 'rim'" may in fact be

an enterprise. *Abbott Labs. v. Adelphia Supply USA*, No. 15-CV-5826 (CBA) (LB), 2017 WL 57802, at *5-6 (E.D.N.Y. Jan. 4, 2017).  In *In re Insurance Brokerage Antitrust Litigation*, 618 F.3d 300 (3d Cir. 2010), for example, the Third Circuit dismissed several purported enterprises as "rimless hub-and-spoke" schemes but found that "allegations of bid rigging," similar to those alleged here, "provide[d] the 'rim' to the . . . enterprise's hub-and-spoke configuration, satisfying *Boyle*'s requirements."  *Id.* at 375; *see also Abbott Labs.*, 2017 WL 57802, at *5-6 (distinguishing between "insufficient, rimless hub-and-spoke formations — such as those made up of competitors engaging in parallel conduct with a common firm — and hub-and-spoke configurations in which the spokes coordinated and cooperated such that an enterprise was formed").

Defendants argue that Nastasi "essentially alleges the existence of a 'rimless' hub-and-spoke RICO enterprise," Defs.' Mem. 21, analogous to the scheme the Second Circuit found insufficient in *D'Addario*, because the allegations "cannot carry Nastasi's burden of suggesting that the various Defendants knew of each other's separate schemes," Defs.' Reply 16.  But, as the Court discussed above in connection with the antitrust claims, Nastasi does plead a hub-and-spoke conspiracy with a rim by alleging that Defendants, including the Subcontractor Defendants, knew of, and actively participated in, the overall Enterprise with a common purpose — "carrying out a bid-rigging scheme, inflating prices, falsifying records and defrauding contractors not participating in the scheme."  Compl. ¶ 231; *see also*, *id*. ¶¶ 87, 115, 124, 128, 145, 156-57, 159, 166, 168-69, 228-31.  Defendants also contend that the Complaint does not allege a single, coherent RICO enterprise, but rather "impermissibly groups the alleged 120 Park and 731 Lexington schemes together."  Donaldson Mem. 2; *see also* Defs.' Reply 15.  "Under RICO," however, "it is irrelevant whether defendants participated in the enterprise's affairs

through different, even unrelated crimes, so long as we may reasonably infer that each crime was intended to further the enterprise's affairs." *United States v. Friedman*, 854 F.2d 535, 562 (2d Cir. 1988) (internal quotation marks omitted).  Here, Nastasi alleges that the Enterprise was formed in connection with the 120 Park Project and that, when Nastasi refused to participate in the bid-rigging and bribery and began to raise concerns with Bloomberg executives, the Enterprise turned its focus to destroying Nastasi through the conduct alleged at the 731 Lexington Project.  *See* Compl. ¶¶ 148-51, 154-57.[8]  Nastasi may or may not be able to prove these allegations, but they are sufficient for present purposes.  Accordingly, the Court concludes that Nastasi has sufficiently alleged a RICO enterprise.

### 3. Predicate Acts

Finally, in order to demonstrate a "pattern of racketeering activity" under the RICO statute, Nastasi must plausibly allege that each Defendant committed at least two "predicate acts."  18 U.S.C. § 1961(5); *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001).  The RICO statute sets forth an "exhaustive list of predicate acts that qualify as 'racketeering activity.'" *Lynch v. Amoruso*, 232 F. Supp. 3d 460, 466 (S.D.N.Y. 2017).  In this case, the Complaint alleges that each Defendant committed two acts of either (1) wire fraud, mail fraud, and bank fraud or (2) commercial bribery, *see* Compl. ¶ 243, all of which are on the RICO predicate list, *see* 18 U.S.C. § 1961(1); *see also* N.Y. Penal L. §§ 180.03, 180.08 (prohibiting the giving and receiving of bribes).  Allegations of wire, mail, and bank fraud are generally subject to the

---

[8]     Contrary to Defendants' assertions, Nastasi's Complaint does allege that Eurotech was part of the 120 Park Project scheme.  *See* Compl. ¶ 134 (alleging that Francisco "requested and received cash and non-cash bribes from . . . Eurotech for work awarded at the 120 Park Project"); *id* ¶ 142 ("Turner instructed Eurotech to submit a losing bid for the drywall job at the 120 Park Project.  Eurotech agreed because Turner steered the concrete work at that site to Eurotech.").

heightened pleading standards of Rule 9(b), which requires that a plaintiff "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b); *see, e.g.*, *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 185 (2d Cir. 2008).  By contrast, bribery is not subject to Rule 9(b).  *See, e.g.*, *Cougar Audio, Inc. v. Reich*, No. 99-CV-4498 (LBS), 2000 WL 420546, at *7 (S.D.N.Y. Apr. 18, 2000) ("Because the allegation of predicate acts of commercial bribery is not an allegation of fraud, Rule 9(b) does not apply."); *accord CNBC, Inc. v. Alvarado*, No. 93-CV-2261 (JFK), 1994 WL 445717, at *2 n.1 (S.D.N.Y. Aug. 17, 1994); *Harris v. Wells*, 757 F. Supp. 171, 174 (D. Conn. 1991).

Defendants make separate arguments on this issue in their individual briefs, but two common themes emerge.  First, most, if not all, Defendants contend that Nastasi's allegations of mail, wire, and bank fraud do not satisfy Rule 9(b).  *See* Defs.' Mem. 23-25; Turner Mem. 1-2; Eurotech & Devlin Mem. 4-6; Francisco Mem. 1-6; Donaldson Mem. 4-7; Campana Mem. 5-7. In doing so, however, they ignore the well-established principle that "allegations may be based on information and belief when facts are particularly within the opposing party's knowledge," provided that the plaintiff "adduce[s] specific facts supporting a strong inference of fraud." *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990).  Pointedly, the Second Circuit has observed that, in this (the RICO) context, "the details" required by Rule 9(b) "are rarely within the knowledge of a victim of fraud and are more appropriately left for discovery."  *Alix*, 23 F.4th at 209.  At this stage, a plaintiff's "allegations need only suggest 'a strong inference of fraud."  *Id.* (internal quotation marks omitted).  Defendants similarly overlook how Rule 9(b) applies "where a plaintiff claims mails or wires were simply used in furtherance of a master plan to defraud, but does not allege that the communications themselves contained false or misleading information."  *Sanchez v. ASA Coll., Inc.*, No. 14-CV-5006 (JMF), 2015 WL 3540836, at *6

(S.D.N.Y. June 5, 2015).  In such situations, the Rule "requires only that the plaintiff delineate, with adequate particularity in the body of the complaint, the specific circumstances constituting the overall fraudulent scheme." *In re Sumitomo Copper Litig.,* 995 F. Supp. 451, 456 (S.D.N.Y. 1998); *accord ASA Coll.*, 2015 WL 3540836, at *6; *Spira v. Nick,* 876 F. Supp. 553, 559 (S.D.N.Y. 1995).  As applied here, that principle means, for example, that Nastasi need not, as Defendants argue, Defs.' Mem. 25, identify with particularity who sent which RFP and when.[9]

Second, Defendants contend that Nastasi's allegations of commercial bribery fall short because they do not specify "how much was paid, when it was paid, or how it was delivered." Defs.' Mem. 26 (quoting *Fuji Photo Film U.S.A., Inc. v. McNulty*, 640 F. Supp. 2d 300, 316 (S.D.N.Y. 2009)).  Admittedly, that argument does find support in a pair of district court cases dismissing claims of bribery for failure to allege such "particularities." *Roberto's Fruit Mkt., Inc. v. Schaffer*, 13 F. Supp. 2d 390, 400 (E.D.N.Y. 1998); *see also Fuji Photo Film U.S.A.*, 640 F. Supp. 2d at 311, 318.  But that requirement cannot be squared with the fact that claims of bribery are subject only to Rule 8(a), not Rule 9(b).  Thus, to state a claim of bribery, a complaint need not contain "detailed factual allegations"; it need only contain sufficient allegations "to nudge [the plaintiff's] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 555, 570; *see, e.g.*, *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Young*, No. 91-CV-2923 (CSH), 1994 WL 88129, at *13 (S.D.N.Y. Mar. 15, 1994) (finding allegations

---

[9]     In their reply brief, Defendants assert that Nastasi's Complaint alleges that the RFPs were "fraudulent themselves, and not merely used in furtherance of a larger scheme to defraud." Defs.' Reply 17.  But, some loose language aside, *see, e.g.*, Compl. ¶ 131 ("The false RFPs issued by Bloomberg . . . were part of a scheme to create the impression of a true and competitive bidding process."), the Complaint does not actually allege that the *requests* themselves were fraudulent; instead, the alleged scheme involved fraudulent activity in the bid-setting process that occurred in response to the RFPs.  *See, e.g.*, Compl. ¶¶ 6-10; *see also* Pl.'s Opp'n 40-41 ("These RFPs were 'incident to an essential part of the scheme' as they helped create the façade of a fair and honest bidding process.").

of bribery sufficient because "[w]hile this type of conclusory statement will clearly not stand up to the rigid requirements of Rule 9(b), it survives the more relaxed pleading requirements of Rule 8(a)"); *United States v. Priv. Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*, 793 F. Supp. 1114, 1135-36 (E.D.N.Y. 1992) (finding sufficient allegations "that certain named defendants committed acts chargeable as bribery" including "brib[ing] officials of the town of Islip in order to allow these defendants and others to dispose of solid waste . . . without paying the required fees"); *see also, e.g., Muscletech Rsch. & Dev., Inc. v. E. Coast Ingredients, LLC*, No. 00-CV-0753A, 2004 WL 941815, at *19 (W.D.N.Y. Mar. 25, 2004) (finding allegations of commercial bribery sufficient because "they are not subject to Rule 9(b)'s heightened pleadings requirement"), *report and recommendation adopted in relevant part,* 2004 WL 2191578 (W.D.N.Y. Sept. 27, 2004).

In light of the foregoing, the Court holds that the Complaint (which incorporates by reference the indictments charging several Defendants with bribery, *see* Compl. ¶ 92) adequately pleads at least two predicate acts as to all Defendants save one: Lauren Eckhart Smith, Bloomberg's Global Head of Facilities and Real Estate.  Put simply, against all but Smith, Nastasi adequately pleads either or both two acts of commercial bribery (Donaldson Defendants: Compl. ¶¶ 16, 25 n.1, 123, 131, 142, 145, 241; Turner: Compl. ¶¶ 10, 16, 25 n.1, 89, 123; *see id.* ¶ 27 (alleging Turner's awareness of its agents' bribery and bid-rigging); *see also Amendolare v. Schenkers Int'l Forwarders, Inc.*, 747 F. Supp. 162, 171 (E.D.N.Y. 1990) (finding that a union could be vicariously liable under RICO for the criminal violations of its agents)); two acts of fraud (Guzzone: Compl. ¶¶ 113, 115, 122, 233); or at least one of each (Guzzone: Compl. ¶¶ 90, 92(ii), 113, 115, 122, 131-32, 138, 169-70, 223, 233; Paulino: Compl. ¶¶ 113, 120, 122-23; Campana: Compl. ¶¶ 90, 92(iii), 113, 115, 122, 131, 133; Nigro: Compl. ¶¶ 25, 92(iv), 114-15,

122, 125-29, 131, 239-41; Francisco: Compl. ¶¶ 131, 134, 157-60; Eurotech and Devlin: Compl. ¶¶ 134, 142, 156-57, 161-63, 168-69; Summerville: Comp. ¶¶ 135, 164-67).[10]  Against Smith, however, Nastasi lodges only one plausible allegation of mail fraud — in connection with her role in the allegedly fraudulent Stop Work Order.  *See* Compl. ¶¶ 164, 236.  Beyond that, the Complaint alleges that she "participated in the scheme to steer jobs at 120 Park," Pl.'s Opp'n 25; *see* Compl. ¶ 146, but it fails to back this conclusory allegation up with any factual allegations regarding her role.  It also alleges that Smith ignored an email from Nastasi, *see* Compl. ¶¶ 149, 236, but ignoring an email is not sufficient to implicate her in the alleged fraud scheme.  *See* Summerville & Smith Mem. 3-4.  Accordingly, the Court concludes that Nastasi fails to adequately allege two predicate acts as to Smith.

### 4.  RICO Conspiracy

That leaves only Nastasi's allegation that Turner, the Turner Defendants, the Subcontractor Defendants, and the Bloomberg Defendants violated 18 U.S.C. § 1962(d) by conspiring to violate § 1962(c).  "[T]o adequately plead a RICO conspiracy under 18 U.S.C. § 1962(d), 'a plaintiff must allege the existence of an agreement to violate RICO's substantive provisions.'"  *One World, LLC v. Onoufriadis*, No. 21-374-CV, 2021 WL 4452070, at *1 (2d Cir. Sept. 29, 2021) (summary order) (quoting *Williams v. Affinion Grp., LLC*, 889 F.3d 116, 124 (2d Cir. 2018)).  "[T]he requirements for RICO's conspiracy charges under § 1962(d) are less demanding than those for substantive violations."  *City of New York v. Bello*, 579 F. App'x 15,

---

[10]    Eurotech and Devlin argue that the allegations against them are "blatantly untrue," citing "documentary evidence" that they submit in connection with their motion to dismiss.  *See* Eurotech & Devlin Mem. 6-7; ECF No. 64.  It is well established, however, that the Court is required to assume the truth of the well-pleaded allegations in the Complaint and may not consider evidence of the sort that Eurotech and Devlin submit.  *See, e.g.*, *Paravas v. Cerf*, No. 21-CV-7463 (RA) (BCM), 2022 WL 203168, at *1 n.1 (S.D.N.Y. Jan. 24, 2022).

17 (2d Cir. 2014).  For the reasons discussed at length above, the Complaint meets these

requirements.  Nastasi specifically alleges that "[t]he Bloomberg Defendants, the Turner

Defendants, Turner, and the Subcontractor Defendants willfully and knowingly agreed and

conspired with other Defendants to commit the above referenced predicate acts," Compl. ¶ 258,

and it backs up that assertion with factual allegations sufficient to support an inference of an

agreement to join a RICO conspiracy, *see* Compl. ¶¶ 5, 8, 74, 86, 122, 142-43, 168, 193; *see*

*Angermeir v. Cohen*, 14 F. Supp. 3d 134, 155 (S.D.N.Y. 2014) (citing cases); *City of New York v.*

*Hatu*, No. 18-CV-848 (PAE), 2019 WL 2325902, at *14 (S.D.N.Y. May 31, 2019); *Sky Med.*

*Supply Inc. v. SCS Support Claims Servs., Inc.*, 17 F. Supp. 3d 207, 230 (E.D.N.Y. 2014)

("'When a defendant has personally committed several acts of racketeering in furtherance of the

enterprise's affairs, the inference of an agreement to join the conspiracy is unmistakable.'"

(quoting *United States v. O'Malley*, 796 F.2d 891, 899 (7th Cir. 1986)).

 The Court reaches that conclusion as to Smith too, notwithstanding its holding above that

the Complaint fails to state a plausible *substantive* RICO claim against her.  It is well established

that "a plaintiff is not required to plead a cognizable, substantive RICO claim against defendants

in order to allege a claim for RICO conspiracy."  *State Farm Mut. Auto. Ins. Co. v. CPT Med.*

*Servs., P.C.*, 375 F. Supp. 2d 141, 150-51 (E.D.N.Y. 2005).  Instead, Nastasi need only plausibly

allege that Smith "intend[ed] to further an endeavor which, if completed, would satisfy all of the

elements of a substantive criminal offense."  *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385

F.3d 159, 178 (2d Cir. 2004); *see also United States v. Yannotti*, 541 F.3d 112 (2d Cir. 2008)

("[T]o be guilty of RICO conspiracy, a defendant need only know of, and agree to, the general

criminal objective of a jointly undertaken scheme.").  Although Nastasi's allegations on that

score as to Smith are admittedly thin, they are, taken together, sufficient to cross the plausibility

threshold. *See, e.g.*, *United States Fire Ins. Co. v. United Limousine Serv., Inc.*, 303 F. Supp. 2d 432, 454 (S.D.N.Y. 2004) ("Considered as a whole, these allegations provide a substantial factual basis from which to infer an agreement among these defendants." (cleaned up)).

**D.  State-Law Claims**

Finally, Nastasi brings negligent supervision and retention claims under New York law against Turner and Bloomberg, alleging that the companies "breached their [duties] to control and supervise the[ir] employees" and their duties "to ensure that they did not retain employees and agents that would harm [Nastasi]."  Compl. ¶¶ 262, 271.  Defendants argue that these claims are deficient because (1) Nastasi does not allege "that the purported conduct resulted in any physical injury to Nastasi, as required under New York law," Defs.' Mem. 29; Bloomberg Mem. 5; (2) Nastasi fails to allege that they "knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence," Defs.' Mem. 29 (internal quotation marks omitted); and (3) "an employer cannot be held responsible for criminal wrongdoing an employee commits outside the scope of his employment, in the absence of specific and plausible allegations that the acts furthered the employer's interest," *id.* at 30; *see also* Bloomberg Mem. 5-6.  These arguments fail to persuade.

First, Defendants are wrong in asserting that physical injury is required for a negligent supervision or retention claim under New York law.  Although some district courts have observed that "[a]lmost every case where a New York court has recognized a negligent retention claim involved significant physical injury to the plaintiff," *Kaupp v. Church*, No. 10-CV-7559 (JFK), 2011 WL 4357492, at *3 (S.D.N.Y. Sept. 19, 2011); *see also* Defs.' Reply 19 n.18 (citing cases), the Second Circuit and other courts have, in fact, upheld negligent supervision or retention claims under New York law based on non-physical injuries, including financial or

emotional injuries, *see, e.g.*, *Rich v. Fox News Network, LLC*, 939 F.3d 112, 129-30 (2d Cir. 2019) (holding that, if the plaintiff amended the complaint to properly allege that the actions were outside the scope of the employee's employment, the plaintiff could pursue negligent supervision and retention claims based on emotional distress); *Miller v. Miller*, 137 N.Y.S.3d 853, 858 (4th Dep't 2020) ("We also reject defendant's contention on its appeal that it was entitled to summary judgment dismissing all of plaintiff's claims to the extent they sought damages for purely emotional injuries."); *Weinberg v. Mendelow*, 979 N.Y.S.2d 29, 32 (1st Dep't 2014) (finding negligent retention and supervision were adequately pleaded where an employee allegedly defrauded investors); *Gray v. Schenectady City Sch. Dist.*, 927 N.Y.S.2d 442, 445-46 (3d Dep't 2011) (same where an employee allegedly vandalized the plaintiff's property and threatened him); *Clark St. Wine & Spirits v. Emporos Sys. Corp.*, 754 F. Supp. 2d 474, 482 (E.D.N.Y. 2010) (same where an employee allegedly stole customer credit card information); *A.I.A. Holdings, S.A. v. Lehman Bros.*, No. 97-CV-4978 (LMM), 1998 WL 159059, at *8 (S.D.N.Y. Apr. 1, 1998) (same where an employee allegedly engaged in a fraudulent investment scheme).

Next, Defendants' assertions aside, *see* Defs.' Mem. 29, Bloomberg Mem. 5-6, Nastasi does plausibly allege that Bloomberg and Turner knew or should have known about their employees' propensity for the conduct at issue. As to Turner, Nastasi alleges that Turner "not only [knew] about the scheme, but it sanctioned the scheme as a tool to control the internal construction market." Pl.'s Opp'n 49; *see, e.g.*, Compl. ¶ 25. And as to Bloomberg, Nastasi's allegations that the fraudulent scheme continued for more than six years, involved multiple high-ranking executives, and would have been uncovered had Bloomberg not been deficient in its supervision of the RFP process, are sufficient to state a claim. Compl. ¶¶ 180-88, *see, e.g.*,

*Rosenfeld v. Lenich*, 370 F. Supp. 3d 335, 356 (E.D.N.Y. 2019) ("If a claim for negligent supervision means anything, it must mean that a claim lies where, as here, a plaintiff has sufficiently alleged that defendants would have discovered a tortfeasor's ongoing tortious conduct but for their negligence in carrying out their supervisory duties.").  Further, Nastasi alleges that, "even after [Turner and Bloomberg were] informed of [their respective employees'] conduct targeting plaintiffs, defendant failed to investigate or discipline [them]."  *Gray*, 927 N.Y.S.2d at 446; *see* Compl. ¶¶ 30, 98.

Finally, Bloomberg and Turner get it exactly backwards when they argue that they cannot be held liable for criminal wrongdoing that their employees commit outside the scope of their employment.  Defs.' Mem. 30.  For a claim of negligent retention or supervision to lie, "[t]he employee . . . must *not* be acting within the scope of his or her employment; for in that situation the employer would only be liable vicariously under the theory of *respondeat superior*, and not for negligent supervision or retention."  *Rich*, 939 F.3d at 129-30 (cleaned up) (emphasis added).  The cases Defendants cite, *see* Defs.' Mem. 30, are distinguishable, as the analysis they quote is related to direct claims against an employer pursuant to either *respondeat superior* or vicarious liability, *see Judith M. v. Sisters of Charity Hosp.*, 93 N.Y.2d 932, 933 (1999) (affirming dismissal of the plaintiff's *respondeat superior* cause of action where the actions alleged were outside the scope of the employee's employment); *C.D. of NYC, Inc. v. U.S. Postal Serv.*, No. 03-CV-5055 (JFK), 2004 WL 2072032, at *4-5 (S.D.N.Y. Sept. 16, 2004) (same).

Accordingly, the Court concludes that there is no basis to dismiss Nastasi's claims of negligent supervision and retention claims against Turner and Bloomberg.

**CONCLUSION**

For the reasons stated above, Defendants' motion to dismiss is DENIED, except that Nastasi's antitrust claims against the Bloomberg Defendants — Bloomberg, Paulino, Francisco, Guzzone, Summerville, Smith, and Campana — and its substantive RICO claims with respect to Smith must be and are dismissed. Defendants are granted **thirty days from the date of this Opinion and Order** to answer the remaining claims. Additionally, by separate Order to be entered today, the Court will reinstate the initial pretrial conference.

The Clerk of Court is directed to terminate ECF No. 56.

SO ORDERED.

Dated: September 23, 2022
      New York, New York

                                           JESSE M. FURMAN
                                 United States District Judge