UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
:
NASTASI & ASSOCIATES, INC., :
:
               Plaintiff, :
:      20-CV-5428 (JMF)
    -v- :
:      OPINION AND ORDER
BLOOMBERG, L.P. et al., :
:
               Defendant. :
:
------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

       In this lawsuit, Plaintiff Nastasi & Associates ("N&A"), a subcontractor, alleges that Bloomberg, L.P., Turner Construction Corp. ("Turner"), Eurotech Construction Corp. ("Eurotech"), Donaldson Acoustics, Co. Inc. ("Donaldson Acoustics"), and various people who are or were employed by these companies (the "Individual Defendants"), organized and participated in a large-scale bid-rigging and bribery scheme. N&A brings antitrust claims pursuant to the Sherman Act, 15 U.S.C. § 1, and the Donnelly Act, N.Y. Gen. Bus. L. § 340 *et seq.*; claims under the Racketeering Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1962(c) and (d); and common-law claims for negligent supervision and negligent retention. Earlier in the case, Defendants moved to dismiss N&A's claims as time barred. ECF No. 56; ECF No. 57, at 8-10. The Court denied the motion based on allegations in N&A's complaint that the Court was required to treat as true. *See Nastasi & Assocs., Inc. v. Bloomberg, L.P.*, No. 20-CV-5428 (JMF), 2022 WL 4448621, at *6 (S.D.N.Y. Sept. 23, 2022) (ECF No. 76). Even so, the Court described the "question" as "a close one." *Id.* Following some discovery, Defendants now move, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment on the ground that N&A's claims are time barred. They also move, pursuant to Rule

37, for spoliation and discovery sanctions.  *See* ECF No. 131.  For the reasons that follow, the Court grants Defendants' motion for summary judgment and grants Defendants' motion for sanctions, but only to the extent that Defendants seek relevant attorney's fees and costs.

## BACKGROUND

This case has a lengthy factual and procedural history, which is summarized here only to the extent it is relevant to the pending motions.  The relevant facts are drawn from the admissible materials submitted by the parties in connection with Defendants' motion — most notably, the undisputed facts set forth in Defendants' Statement of Material Facts, *see* ECF No. 133 ("SOMF"); *see also* ECF No. 136 ("Pl.'s Resp. to SOMF").  Unless otherwise noted, they are either undisputed or described in the light most favorable to N&A.  *See, e.g.*, *Costello v. City of Burlington*, 632 F.3d 41, 45 (2d Cir. 2011).

### A.  The Alleged Scheme

N&A was an interior drywall subcontractor that, until 2015, performed various work for Bloomberg and Turner.  SOMF ¶ 1.  In 2010, Bloomberg began work at its 120 Park Avenue Offices (the "120 Park Project") and hired Turner to perform construction management services for the project.  *Id.* ¶¶ 3-4.  The same year, Turner began issuing requests for proposals ("RFPs") for work to be performed on the 120 Park Project.  *Id.* ¶ 9.  N&A submitted bids for three different jobs, but was turned down for all of them.  *Id.* ¶¶ 10-12.  After the third unsuccessful bid, Anthony Nastasi ("Nastasi"), the sole owner and President of N&A, *id.* ¶ 2, wrote to Anthony Guzzone, a Bloomberg employee, to express his frustration: "I was greatly disappointed especially at the fact that I was the legitimate low bidder but somehow the #'s changed at the last minute and I lost the job by 10k?" *Id.* ¶ 14.  After Guzzone replied, Nastasi wrote back: "I'm 0 for 3.  You can't tell me that someone isn't playing around.  I've been in the

game way to[o] long not to recognize the problem. I've been low 2 out of the 3 [bids] and yet nobody says anything and allows [T]urner to play games. . . . I know when I'm not playing in a level field and I will not give [T]urner the satisfaction of wasting my time anymore with them . . . when Turner is gonna do what they want to do and Bloomberg sits by and allows it. . . . I'm rarely wrong about these things! Been in this business way too long!!" *Id.* ¶ 16.

Nastasi then emailed a colleague and a former colleague from N&A about having lost the bid by $10K, alleging that Turner had manipulated the bid of competitor, Defendant Donaldson Acoustics, to be lower than the N&A bid: "We were 200k low and yet [T]urner leveled [D]onaldson to 10k lower than us!! I'm done with [T]urner and [B]loomberg." *Id.* ¶¶ 18, 20. The others responded: "Looks like this was a set up from the start" and "I know, this is some crap." *Id.* ¶¶ 19, 20. Nastasi replied to one in turn: "I just told [T]urner and [B]loomberg to remove us from the bidding lists as I will no longer play the game!!!" *Id.* ¶ 21 (emphasis omitted). Around the same time, Nastasi had "several conversations" with Guzzone, the Bloomberg employee, in which he "alerted Guzzone to the fact that Turner Construction was purposely manipulating bids." *Id.* ¶ 24. In one of these conversations, in or about June 2011, Guzzone allegedly told Nastasi to "give me a reason to do something about this." *Id.* ¶ 25.

In 2010, Nastasi began providing information to the District Attorney's Office for New York County ("DANY"). *Id.* ¶¶ 26-29. In 2012, Nastasi executed a "Cooperation and Non-Prosecution Agreement" with DANY. *Id.* ¶ 29. Nastasi later attested that he went to DANY "to educate them in their investigation of the NYC construction industry" because he "was tired of being extorted on a regular bases [sic] from [his] clients in pushing the grey areas of what is and what isn't illegal, and [he] refused to play the 'pay to play game' . . . . The end result was disastrous when certain high level executives at certain companies (Bloomberg and Turner, who

3

are now going to jail)[] found out and cancelled my contracts in 2015 . . . ." *Id.* ¶ 35. He noted that he had "reported extortion, bribery and other illegal activities that were occurring in the New York City construction industry" to DANY. *Id.* ¶ 39. From 2010 to 2015, Nastasi was allegedly given various explanations for the failure of N&A's bids, namely that it "had nothing to do with bid rigging and was purely a matter of corporate politics" and "that Douglas Donaldson," the principal of Donaldson, "was married to the niece of Bloomberg Director Martin Geller." *Id.* ¶¶ 43-45. In an encounter with Individual Defendants Javier Paulino and Fay Devlin at the Havana Club in early 2015, however, Devlin advised Nastasi "that a bribe was the cost of doing business with Bloomberg and Turner" and that "you've got to take care of Javier Paulino in order to keep those jobs." *Id.* ¶¶ 47-51. Nastasi later declared: "By 2015, after losing approximately seven or eight manipulated bids, all of which N&A should have won based on its competitive bid proposal as submitted, I decided to have N&A stop bidding on Bloomberg projects altogether because of my concerns with the bidding process." *Id.* ¶ 46.

In April 2015, Bloomberg terminated an agreement with N&A for the latter to do maintenance work at a different site. *Id.* ¶ 61. N&A alleges that Defendants then proceeded to "destroy[]" its business. *Id.* ¶¶ 53, 63. Specifically, Turner issued default notices to N&A for several non-Bloomberg jobs on which N&A had been working, the Carpenter's Union issued a Stop Work Order based on asserted delinquent benefits owed, and several companies filed mechanic's liens and lawsuits against N&A for failure to pay amounts owed for materials and supplies. *Id.* ¶¶ 60-67. N&A's General Counsel sent a letter to Bloomberg and Eurotech asserting that they were coercing N&A employees to leave N&A and work for Eurotech, and Nastasi later emailed Individual Defendant Lauren Smith, a Bloomberg employee, an email referring to "the illegal termination and theft of [N&A] and [its] employees by" Defendants. *Id.*

¶¶ 68, 70.  Litigation and threats of litigation, between N&A and its former employees and between N&A and the Carpenters Union and suppliers asserting outstanding debts, followed. *Id.* ¶¶ 67-80.  Nevertheless, in May 2015 Nastasi "turned off" the emails of all N&A employees other than himself, without first preserving them in any form, and in December 2015, he destroyed all of N&A's equipment, records, files, and supplies, retaining only files related to certain outstanding insurance cases. *Id.* ¶¶ 81-89.

**B.  Procedural History**

N&A first sued Defendants in this Court on December 31, 2018.  *See Nastasi & Assocs., Inc. v. Bloomberg, L.P.*, No. 18-CV-12361 (JMF) (S.D.N.Y. Dec. 18, 2018), ECF No. 1. Defendants moved to dismiss that case for lack of standing because, effective January 1, 2017, N&A had assigned all of its assets to a third party, the Franklin D. Nastasi Trust (the "FDN Trust"), and had not "move[d] to join or substitute the FDN Trust as a plaintiff." *Nastasi & Assocs., Inc. v. Bloomberg, L.P.*, No. 18-CV-12361 (JMF), 2020 WL 1166055, at *1-2 (S.D.N.Y. Mar. 11, 2020).  By Memorandum Opinion and Order entered on March 11, 2020, the Court granted the motion.  *See id.*  Significantly, the Court noted in a footnote that, "even if" the defect at issue were analyzed under Rule 17 of the Federal Rules of Civil Procedure, as some courts had suggested, dismissal was still required because N&A had "fail[ed] to proffer any 'semblance of any reasonable basis' for not adding or substituting the FDN Trust" within a "reasonable time," as required by Rule 17(a)(3).  *Id.* at *2 n.1.  N&A appealed from the judgment and, in light of an intervening change in the law (namely, confirmation that a pre-suit assignment does not extinguish Article III standing), the Second Circuit vacated and remanded, directing the Court to reconsider its "alternative holding" under Rule 17 in light of the intervening decision.  *Nastasi & Assocs., Inc. v. Bloomberg, L.P.*, 843 F. App'x 413, 414 (2d Cir. 2021) (summary order) (citing

*Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 380 (2d Cir. 2021)).  On remand, this Court reaffirmed its dismissal, "adher[ing] to its prior alternative ruling dismissing Nastasi's claims under Rule 17."  *Nastasi & Assocs., Inc. v. Bloomberg, L.P.*, No. 18-CV-12361 (JMF), 2021 WL 3541153, at *1 (S.D.N.Y. Aug. 11, 2021).

On July 14, 2020, while its appeal in the 2018 case was pending, N&A filed this lawsuit, "asserting nearly identical claims . . . against the same Defendants . . . aris[ing] out of the same facts and occurrences."  ECF No. 15, ¶ 3.  N&A proffered that the lawsuit "was commenced to prevent any issues regarding the statute of limitations that could occur if [it] waited to file a new action until after the resolution of the Appeal."  *Id.*  At the parties' request, the Court stayed the case pending resolution of the appeal.  *See* ECF No. 16.  The Court lifted the stay after its decision on remand to reaffirm dismissal of the 2018 case.  *See* ECF No. 25.  Thereafter, Defendants moved to dismiss on various grounds, including timeliness.  *See* ECF Nos. 56-57.  As noted, the Court denied the motion on the ground that Defendants' timeliness argument turned on "factual issues" that could not be "resolve[d] on a motion to dismiss" but described the "question" as a "a close one."  *Nastasi & Assocs.*, 2022 WL 4448621, at *6.  After several months of discovery, Defendants sought, and the Court granted, leave to file a partial motion for summary judgment on timeliness grounds and a spoliation motion.  *See* ECF No. 112.  These motions (and a stay of further discovery) followed.  *See* ECF No. 148.

## SUMMARY JUDGMENT MOTION

The Court begins with Defendants' summary judgment motion.  Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate where the admissible evidence and the pleadings demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A dispute as to a material fact qualifies as

genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). The moving party bears the initial burden of demonstrating the absence of such a genuine issue. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (citing *Celotex*, 477 U.S. at 322-23); *accord PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam).

In ruling on a motion for summary judgment, all evidence must be viewed "in the light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Military & Naval Affairs*, 373 F.3d 83, 89 (2d Cir. 2004), and the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004). To defeat a motion for summary judgment, however, the non-moving party must advance more than a "scintilla of evidence," *Anderson*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (citation omitted). Affidavits submitted in support of, or opposition to, summary judgment must be based on personal knowledge, must "set forth such facts as would be admissible in

evidence," and must show "that the affiant is competent to testify to the matters stated therein." *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) (quoting Fed. R. Civ. P. 56(e)).

As noted, Defendants contend that they are entitled to summary judgment because N&A's claims are barred by the applicable statutes of limitations. ECF No. 134 ("Defs.' Mem."), at 15-23. The Court agrees as to N&A's federal claims but concludes that the question of whether N&A's state-law claims are barred by their statutes of limitations is a question for the New York state courts.

**A. N&A's Federal Law Claims Are Presumptively Time Barred**

It is undisputed that all of N&A's federal claims — for antitrust violations and violations of the RICO statute — are subject to four-year statutes of limitations. *See* 15 U.S.C. § 15b (federal antitrust); *Zirvi v. Flatley*, 838 F. App'x 582, 585 (2d Cir. 2020) (summary order) (civil RICO). But the rules for determining when the claims accrued are slightly different. N&A's antitrust claims accrued at the time that Defendants committed the "act that injure[d]" the subcontractor, *see SL-x IP S.à.r.l. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, Nos. 21-2697, 21-2699, 2023 WL 2620041, at *2 (2d Cir. Mar. 24, 2023) (summary order), which was in 2011, when Defendants allegedly "leveled" N&A's bids in order to award contracts to other bidders in exchange for bribes, SOMF ¶¶ 10-16. Because N&A did not file this lawsuit until July 2020, it follows that N&A's antitrust claims are presumptively time barred, subject to N&A's tolling arguments discussed below. By contrast, the statute of limitations on a RICO claim "runs from when the plaintiff discovered, or should have discovered, his *injury*; it does not matter whether the plaintiff has uncovered the pattern of predicate acts necessary to make out a civil RICO claim." *Alix v. McKinsey & Co., Inc.*, No. 18-CV-4141 (JMF), 2023 WL 5344892, at *5 (S.D.N.Y. Aug. 18, 2023) (citing, e.g., *Rotella v. Wood*, 528 U.S. 549, 555-56 (2000)); *accord*

*Koch v. Christie's Int'l PLC*, 699 F.3d 141, 150-51 (2d Cir. 2012).[1] "[I]nquiry notice is tied to actual or constructive knowledge of at least some form of significant harm and of a factual cause linked to another's conduct, without the necessity of notice of the full extent of the injury . . . or precise cause." *Ayers v. Piaker & Lyons, P.C.*, 748 F. App'x 368, 370 (2d Cir. 2018) (summary order) (internal quotation marks omitted); *accord 2002 Lawrence R. Buchalter Alaska Tr. v. Phila. Fin. Life Assurance Co.*, 717 F. App'x 35, 38 (2d Cir. 2017) (summary order).

Applying these standards here, the Court concludes that N&A's RICO claims likely accrued in 2011 and certainly accrued no later than 2015. Indeed, it is plain from the undisputed facts that N&A had inquiry notice — if not actual notice — of any injury arising out of the alleged bid-rigging scheme at the time that its third bid for work on the 120 Park Project was denied in June 2011. Among other things, Nastasi's contemporaneous emails demonstrate his belief that N&A "was the legitimate low bidder"; that "somehow the #'s changed at the last minute and [N&A] lost the job by 10k"; that "[T]urner leveled [D]onaldson to 10k lower than [N&A]"; and that N&A was "not playing in a level field." SOMF ¶¶ 10-12, 15, 14, 18-21. He believed Turner was "play[ing] games"; received a message saying "Looks like this was a set up from the start"; and wrote: "You can't tell me that someone isn't playing around. I've been in the game way to[o] long not to recognize the problem. . . . I'm rarely wrong about these things! Been in this business way too long!!" *Id.* ¶¶ 16, 19. Nastasi further believed "that Turner Construction was purposely manipulating bids" and, when he alerted Guzzone to that fact,

---

[1] RICO has a "separate-accrual rule," meaning that if a plaintiff "at a later date" suffers "a new and independent injury" from a RICO violation, "his right to sue for damages from [the later] injury accrues at the time he discovered or should have discovered that injury." *Elnenaey v. JP Morgan Chase Bank, N.A.*, No. 20-CV-5430 (RPK), 2022 WL 4539374, at *5 (E.D.N.Y. Sept. 28, 2022) (quoting *Bankers Tr. Co. v. Rhoades*, 859 F.2d 1096, 1103 (2d Cir. 1988)) (cleaned up). The separate-accrual rule has no effect on the analysis or outcome here.

9

received a response that anyone — and certainly someone with his avowed awareness of the "pay to play game" in the local construction industry, *id.* ¶¶ 35, 39 — would understand as an invitation for a bribe: "[G]ive me a reason to do something about this." *Id.* ¶¶ 24-25.[2]

N&A's contention that it lacked notice because it reasonably relied on the reassurances of a Turner employee that its rejected bid "was simply a matter of corporate politics and nothing more," ECF No. 135 ("Pl.'s Opp'n"), at 7-8, is without merit. It is well established that plaintiffs may not "rely on 'reassuring comments' given them after they received constructive knowledge of the fraud." *In re Integrated Res. Real Estate Ltd. P'ships Sec. Litig.*, 815 F. Supp. 620, 640 (S.D.N.Y. 1993) (quoting *Zola v. Gordon*, 685 F. Supp. 354, 366 (S.D.N.Y. 1988)). So too, the fact that N&A "is not a part of law enforcement and does not have the power to launch his own investigations" is irrelevant. Pl.'s Opp'n 15; *see Ayers*, 748 F. App'x at 371. In any event, N&A certainly had actual notice of the bid-rigging scheme by 2015, when Devlin advised Nastasi "that a bribe was the cost of doing business with Bloomberg and Turner" and disclosed that "you've got to take care of Javier Paulino in order to keep those jobs." SOMF ¶¶ 47-51. That this conversation "didn't even come back to" Nastasi "until all of this started to, you know, happen" does not matter; the conversation, which is undisputed, provided N&A with actual notice of the alleged bid-rigging scheme. Pl.'s Resp. to SOMF ¶ 52. That conclusion is further corroborated by the fact that, the same year, "after losing approximately seven or eight manipulated bids, all of which N&A should have won based on its competitive bid proposal as submitted," N&A "stop[ped] bidding on Bloomberg projects altogether because of [its] concerns with the bidding

---

[2]  There are disputes with respect to the substance of some of Nastasi's conversations with DANY, but it is undisputed that he "reported extortion, bribery and other illegal activities that were occurring in the New York City construction industry" and referred generally to the "pay to play game." SOMF ¶¶ 35, 39.

process." SOMF ¶ 46.  In the face of all this undisputed evidence, N&A's conclusory assertions denying actual knowledge, *see, e.g.*, Pl.'s Opp'n 9, are not enough.  *See, e.g.*, *Morton v. Time Warner Cable*, No. 11-CV-888 (JMF), 2013 WL 638884, at *2 (S.D.N.Y. Feb. 21, 2013) (noting that a party "cannot defeat" a summary judgment motion "by relying on the allegations in [its] pleading or on conclusory statements").  It follows that N&A's RICO claims are also presumptively time barred.

**B. N&A's Tolling Arguments Fall Short**

The Court turns, then, to the question of whether any tolling doctrine salvages N&A's federal claims.  N&A presses two theories: fraudulent concealment and equitable tolling from the date it filed the 2018 lawsuit against Defendants.  *See* Pl.'s Opp'n 21-22.  Both fail.

N&A's fraudulent concealment argument can be swiftly rejected.  At the motion to dismiss stage, the Court concluded that, assuming the allegations in the Complaint to be true, N&A had plausibly alleged fraudulent concealment but noted that the question was "a close one."  *Nastasi & Assocs., Inc.*, 2022 WL 4448621, at *6.  That is no longer the case.  Equitable estoppel's "application is narrow 'because if applied too liberally it threatens to undermine the purpose of statutes of limitations of allowing potential defendants predictability and ultimate repose.'"  *Geiss v. Weinstein Co. Holdings LLC*, 383 F. Supp. 3d 156, 172 (S.D.N.Y. 2019) (quoting *Veltri v. Bldg. Serv. 32B-J Pension Fund*, 393 F.3d 318, 326 (2d Cir. 2004)).  To benefit from fraudulent concealment, a plaintiff must establish "(1) that the defendant concealed from him the existence of his cause of action, (2) that he remained in ignorance of that cause of action until some point within four years of the commencement of his action, and (3) that his continuing ignorance was not attributable to lack of diligence on his part."  *SL-x IP S.à.r.l.*, 2023 WL 2620041, at *3; *see also Koch*, 699 F.3d at 157.  Here, for the reasons discussed above, N&A's

argument fails at step two. That is, the undisputed facts make plain that N&A did *not* in fact "remain[] in ignorance." N&A's fraudulent concealment argument therefore fails.

N&A's second theory — that the statute of limitations was tolled during the pendency of its 2018 case — also falls short. At first glance, the argument looks like little more than a Federal Rule of Civil Procedure 15(c)(1) relation-back argument in equitable clothing. Wisely, however, N&A does not actually invoke Rule 15(c)(1) itself because the rule applies by its terms only where "[a]n *amendment to a pleading* relates back to the date of the *original pleading*" and does not apply across different actions. Fed. R. Civ. P. 15(c)(1); *see also Palatkevich v. Choupak*, 152 F. Supp. 3d 201, 226 (S.D.N.Y. 2016) ("The relation back doctrine has application only in instances where an original pleading is amended. . . . The amendment does not, however, relate back to any prior proceedings which are not part of the action in question."); *accord In re GNK Enters., Inc.*, 197 B.R. 444, 448-49 (S.D.N.Y. 1996) ("Rule 15(c) applies only to the initial proceeding, not to another, untimely, proceeding."). Instead, N&A argues that the statute of limitations should be equitably tolled from the date it filed the 2018 lawsuit because it "did not sleep on [its] rights but brought an action within the statutory period." Pl.'s Opp'n 21-22 (citation omitted). Accepting that argument, however, would be in tension, if not inconsistent, with this Court's conclusion in the 2018 action — reaffirmed on remand — that N&A "had failed to take steps to cure the [real-party-in-interest] defect within a 'reasonable time' as required by Rule 17(a)(3)." *Nastasi & Assocs.*, 2021 WL 3541153, at *1. Indeed, at bottom, what N&A seeks is not even a second bite at the apple, but a third. To permit that would run roughshod over the Federal Rules of Civil Procedure and equitable principles alike.

The cases on which N&A relies — *Burnett v. N.Y. Central Railroad Co.*, 380 U.S. 424 (1965), and *Veltri v. Building Service 32B-J Pension Fund*, 393 F.3d 318 (2d Cir. 2004) — do

not suggest otherwise. In *Burnett*, the Supreme Court applied equitable tolling where a plaintiff had filed suit under the Federal Employers' Liability Act ("FELA") in state court within the relevant limitations period and, after the suit was dismissed on the basis of improper venue, promptly refiled in federal court after the limitations period had passed. *See* 380 U.S. at 424-45. Citing the fact that federal law and some states' laws permitted transfers to cure venue defects, the Court concluded that declining to apply equitable tolling would "do . . . violence to the policies underlying [FELA's] limitation provision" and "produce a substantial nonuniformity by creating a procedural anomaly" in states without a transfer provision. *Id.* at 430-34. But there are two critical differences between *Burnett* and this case. First, in *Burnett*, the Court stressed that the ultimate question is one of legislative intent and "whether congressional purpose is effectuated by tolling the statute of limitations in given circumstances." *Id.* at 426-27. There, the Court concluded that equitable tolling would advance Congress's purposes. Here, no such argument is available. In fact, giving N&A a third bite at the apple would frustrate legislative intent (as embodied in the Federal Rules). Second, the *Burnett* Court stressed that the petitioner had not "slept on his rights" insofar as he filed suit in federal court only eight days after dismissal in state court. *Id.* at 428-29. N&A did not act with similar dispatch, as the Court concluded in dismissing the 2018 action and reaffirming that decision on remand from the Second Circuit.

The Second Circuit's decision in *Veltri* is even farther afield from this case. The question in *Veltri* was whether a pension fund's failure to comply with federal regulations requiring it to notify a plan member of his right to administrative appeal and to then seek judicial review entitled the plan member to equitable tolling of the applicable six-year statute of limitations. *See* 393 F.3d at 322. N&A quotes *Veltri* for the proposition that "[e]quitable tolling has been held

13

appropriate where plaintiff filed and served defective papers before the expiration of the statutory period." *Id.* at 322-23 (citing *American Pipe & Const. Co v. Utah*, 414 U.S. 538, 558 (1974). N&A, however, conspicuously ignores what the Second Circuit said before and after that select quotation. First, the Court stressed that "[e]quitable tolling is an extraordinary measure that applies *only when plaintiff is prevented from filing despite exercising that level of diligence which could reasonably be expected in the circumstances*." *Id.* at 322 (emphasis added). Here, nothing "prevented" N&A from filing earlier. Nor can it be said that N&A exercised that level of diligence which could reasonably be expected in the circumstances. Second, later in its opinion, the Circuit made plain that "a plaintiff who has actual knowledge of the right to bring a judicial action . . . may not rely on equitable tolling . . . ." *Id.* at 326. Here, of course, the record makes plain that N&A had actual knowledge of its right to file suit no later than 2015.

In short, N&A's tolling arguments are without merit. It follows that its federal claims are barred by the applicable statute of limitations. Accordingly, they must be and are dismissed.

**C. The Court Declines Supplemental Jurisdiction Over N&A's State-Law Claims**

Having dismissed all of N&A's federal claims, the Court must decide whether to exercise supplemental jurisdiction over its remaining state-law claims. A district court "may decline to exercise supplemental jurisdiction over a [pendent state law claim] if . . . the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "[I]n the usual case in which all federal-law claims are eliminated before trial," as here, "the balance of factors to be considered under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988); *see*

*also Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well."); *Anderson v. Nat'l Grid, PLC*, 93 F. Supp. 3d 120, 147 (E.D.N.Y. 2015) ("In the interest of comity, the Second Circuit instructs that absent exceptional circumstances, where federal claims can be disposed of . . . [on] summary judgment grounds, courts should abstain from exercising pendent jurisdiction." (internal quotation marks omitted)). Here, there is no basis to depart from that general rule — especially because N&A makes a tolling argument under New York law, *see* Pl.'s Mem. 22, as to which Defendants do not substantively respond, *see* ECF No. 141 ("Defs.' Reply"), at 11 n.9. Accordingly, N&A's state-law claims are dismissed without prejudice to refiling in state court. *See, e.g.*, *Black v. Ganieva*, 619 F. Supp. 3d 309, 351 (S.D.N.Y. 2022).

## MOTION FOR SPOLIATION AND DISCOVERY SANCTIONS

That leaves Defendants' motion for spoliation and discovery sanctions. Defendants seek sanctions on two grounds. First, they assert that spoliation sanctions are warranted based on N&A's failure to preserve its employees' emails, failure to preserve Nastasi's texts, and disposal of nearly all of N&A's books and records in December 2015. *See* SOMF ¶¶ 81, 83-84; *see also* Defs.' Mem. 24. Second, Defendants seek sanctions based on N&A's failure to disclose in discovery what they call the "2021 Admission" — a "signed, notarized letter" written by Nastasi in connection with a pistol licensing appeal in which he, Defendants claim, admitted to knowledge of Defendants' wrongdoing as early as 2010. *See* SOMF ¶¶ 31-36; *see also* Defs.' Mem. 32-33. The Court will address each of these arguments in turn.

### A. Spoliation

It is undisputed that a "litigant has the duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of

15

admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request." *Passlogix, Inc. v. 2FA Tech., LLC*, 708 F.Supp.2d 378, 409 (S.D.N.Y. 2010) (internal quotation marks omitted).  The obligation to preserve evidence — including electronically stored information — "arises when the party has notice that the evidence is relevant to litigation . . . for example when a party should have known that the evidence may be relevant to future litigation."  *In re Pfizer Inc. Sec. Litig.*, 288 F.R.D. 297, 313 (S.D.N.Y. 2013); *see generally Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216–18 (S.D.N.Y. 2003) (discussing the obligation to preserve electronically stored information).  If triggered, the obligation to preserve requires a litigant to do more than refrain from intentionally destroying relevant evidence; the litigant must also "take affirmative steps to prevent inadvertent spoliation."  *R.F.M.A.S., Inc. v. So*, 271 F.R.D. 13, 24 (S.D.N.Y. 2010).  That means, among other things, that the litigant "must identify all sources of potentially relevant evidence and implement a 'litigation hold' suspending any routine document destruction or other processes involved in the ordinary course of business that might result in the destruction of potentially relevant evidence."  *Id.*

If a party violates its duty to preserve evidence, the other party may seek spoliation sanctions. "Spoliation is 'the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.'" *Orbit One Commc'ns, Inc. v. Numerex Corp.*, 271 F.R.D. 429, 435 (S.D.N.Y. 2010) (quoting *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 107 (2d Cir. 2001)).  Where a party seeks sanctions based on the spoliation of evidence, it must establish "that the sought-after evidence actually existed and was destroyed." *Farella v. City of N.Y.*, No. 05–CV–5711 (NRB), 2007 WL 193867, at *2 (S.D.N.Y. Jan. 25, 2007) (emphasis omitted); *accord Binson v. Max*

*Kahan, Inc.*, No. 12–CV–4871 (ER), 2014 WL 5089751, at *7 (S.D.N.Y. Sept. 30, 2014). In addition, it must show that "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed 'with a culpable state of mind'; and (3) that the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002) (citation omitted).

Applying the foregoing standards here, the Court concludes that spoliation sanctions are warranted. First, N&A plainly had an obligation to preserve evidence relating to this litigation by April 2015, when its General Counsel sent an email to Bloomberg and Eurotech explicitly warning of litigation related to Defendants' alleged destruction and theft of N&A. SOMF ¶ 68. Although N&A attempts to dismiss this and other facts as pertaining to "unrelated matters," Pl.'s Opp'n 27, that attempt falls short; as Defendants correctly contend, "these alleged events are central to the Complaint's allegations that 'Bloomberg, Turner, and Eurotech fraudulently conspire[d] to destroy [N&A]," Defs.' Reply 1. Second, given the virtual storm of litigation surrounding N&A at the time that its documents, files, and equipment were disposed of, *see* SOMF ¶¶ 58-80, the Court has no trouble concluding that N&A was at least negligent in failing to preserve potentially relevant evidence, *see Residential Funding Corp.*, 306 F.3d at 108 ("[T]he 'culpable state of mind' factor is satisfied by a showing that the evidence was destroyed 'knowingly, even if without intent to [breach a duty to preserve it], or *negligently*.'" (citation omitted)).

It is more difficult to determine what the missing evidence might have shown (or whether it would have supported any asserted defenses) but given the Court's independent conclusion

17

above that Defendants are entitled to summary judgment, it need not determine whether any adverse inference would be appropriate as a sanction. *See Europe v. Equinox Holdings, Inc.*, 592 F. Supp. 3d 167, 178 (S.D.N.Y. 2022) ("The requirement that a movant show that the evidence would have supported his or her case serves the purpose of elucidating the appropriate remedy for the spoliation."). That aspect of Defendants' motion is thus denied as moot. Defendants were plainly prejudiced, however, by having to pursue the question of spoliation — including by filing the instant motion. Accordingly, the Court grants the motion to the extent that it seeks an award of reasonable attorney's fees and costs related to the litigation of Defendants' sanctions motion. *See In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 341 F.R.D. 474, 527 (S.D.N.Y. 2022) ("Rule 37(e)(1) authorizes a court to award attorneys' fees and costs to the moving party to the extent reasonably necessary to remediate any prejudice caused by the spoliation."); Fed. R. Civ. P. 37(e)(1).[3]

**B. Discovery Violations**

Sanctions are also warranted for N&A's violation of its discovery obligations. Where a party alleges that the opposing party failed to disclose documents it was required to produce, the "moving party bears the burden of showing that its adversary failed timely to disclose information required by Rule 26." *In re Sept. 11th Liab. Ins. Coverage Cases*, 243 F.R.D. 114, 125 (S.D.N.Y. 2007). To satisfy this burden, the moving party must demonstrate: "(1) that the party having control over the evidence had an obligation to timely produce it; (2) that the party that failed to timely produce the evidence had 'a culpable state of mind'; and (3) that the missing

---

[3] Because the Court does not find sanctions beyond fees and costs incurred in the litigation of the spoliation motion to be warranted, the 2015 amendments to Rule 37 — "reject[ing]" the notion "that negligently destroying ESI [electronically stored information] satisfies the culpable state of mind that warrants 'severe spoliation sanctions,'" *Europe*, 592 F. Supp. 3d at 175 (citing 2015 Advisory Notes to Rule 37(e)) — are immaterial.

evidence is 'relevant' to the party's claim or defense such that a reasonable trier of fact could find it would support that claim or defense." *Id.* (quoting *Residential Funding*, 306 F.3d at 101). Notably, N&A does not contest Defendants' arguments on this front. Nor could it, as N&A had knowledge and control of the 2021 Admission (no less so because it was "publicly available," Pl.'s Resp. to SOMF ¶ 96); had an obligation to produce it, *see* SOMF ¶¶ 95-96; was at least negligent in failing to produce it; and the information it contained was plainly relevant to Defendants' statute of limitations defense. That said, because Defendants did procure the 2021 Admission and the Court independently granted summary judgment, the only prejudice to Defendants are the costs incurred in locating and procuring it. *See generally Doug's World Clocks.com PTY Ltd. v. Princess Int'l, Inc.*, 323 F.R.D. 167, 174 (S.D.N.Y. 2017) ("In determining what sanctions to impose, the Court must consider . . . . the extent to which the prevailing party has been prejudiced by the defaulting party's noncompliance."). Accordingly, the Court further awards Defendants any costs incurred in locating and procuring the 2021 Admission.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED and N&A's claims are dismissed, albeit without prejudice to refiling the state-law claims in state court. Defendants' motion for spoliation and discovery sanctions is GRANTED in part and DENIED in part as moot. The parties shall, **within two weeks** of the date of this Opinion and Order, meet and confer regarding the amount due to Defendants. If the parties are able to reach an agreement, they shall promptly file a stipulation and joint proposed order. If the parties are unable to reach agreement, Defendants shall, **within three weeks** of the date of this Opinion and Order, submit an accounting of its relevant attorneys' fees and costs, supported by

contemporaneous billing records.[4]  In that event, N&A shall file any response **within four weeks** of the date of this Opinion and Order.  No reply may be filed absent leave of Court.

The Clerk of Court is directed to terminate ECF No. 131, enter judgment consistent with this Order, and close the case.

SO ORDERED.

Dated: February 15, 2024
       New York, New York

_____
JESSE M. FURMAN
United States District Judge

---

[4] To be clear, the relevant fees and costs with respect to the spoliation sanctions are those relating to the spoliation motion.  Thus, in the event of disagreement, Defendants should distinguish in their submissions between fees and costs associated with their motion for summary judgment and fees and costs associated with their spoliation motion.